FOURTH DIVISION
JULY 26, 2007

No. 1-06-1297

| | | |
|---|---|---|
| HILARIA LOPEZ, Individually and as Special | ) | Appeal from the |
| Administrator for the Estate of Giselle Lopez, | ) | Circuit Court of |
| Deceased, and ROBERT DE LEON, | ) | Cook County. |
| | ) | |
| Plaintiffs-Appellants, | ) | |
| | ) | |
| v. | ) | No. 01 L 12470 |
| | ) | |
| NORTHWESTERN MEMORIAL HOSPITAL, | ) | |
| MICHAEL SOCOL, and JENNIFER CHAN, | ) | Honorable |
| | ) | Thomas L. Hogan, |
| Defendants-Appellees. | ) | Judge Presiding. |

JUSTICE CAMPBELL delivered the opinion of the court:

This medical malpractice action was brought against defendants Northwestern Memorial Hospital, Dr. Michael Socol and Dr. Jennifer Chan regarding the labor of plaintiff Hilaria Lopez and the delivery of her infant, the late Giselle Lopez. Hilaria and the deceased infant's father, Roberto De Leon, also filed claims under the Wrongful Death and Survival Acts. Following a trial, the jury rendered a verdict in favor of the defendants. Plaintiffs now appeal.

The record on appeal discloses the following facts.[1] Hilaria and Roberto arrived at Northwestern at approximately 7 a.m. on December 25, 1999. Hilaria was in labor with her fourth child. Dr. Socol was the attending physician; Dr. Chan was an assisting physician. After the fetus exhibited concerning fetal heart rate decelerations, the infant Giselle was delivered by caesarian section at 7:08 p.m. At that time it was discovered that Hilaria's uterus had ruptured; Giselle was found floating partially outside the uterus. Giselle died on February 19, 2000.

At trial, Hilaria testified that her three other children were born without incident. Hilaria was not sure when she first saw Dr. Chan, but she first saw Dr. Socol at 6 p.m. on December 25. Hilaria testified that Dr. Socol and others pushed on her stomach at approximately 6:30 p.m., for approximately 15 to 20 minutes, in what Hilaria believed was effort to deliver the baby. DeLeon

---

[1] Illinois Supreme Court Rule 341 requires an appellant to submit a brief that contains a statement of facts which makes "appropriate references to the pages of the record on appeal." 210 Ill. 2d 4. 341(h)(6). Appellants' brief here makes not a single reference to the record on appeal. 210 Ill. 2d 4. 341(h)(6). "A party's failure to comply with Rule 341 is grounds for disregarding its arguments on appeal based on an unreferenced statement of facts." Jeffrey M. Goldberg & Associates, Ltd. v. Collins Tuttle & Co., 264 Ill. App. 3d 878, 886 (1994); Coombs v. Wisconsin National Life Insurance Co., 111 Ill. App. 3d 745, 746 (1982). However, given the seriousness of the case, combined with the record citations provided in appellees' supplemental statements of facts and in the argument of appellants' brief, this court will, in its discretion, consider the appeal on the merits as to those issues for which appellants have otherwise complied with the supreme court rules.

testified by evidence deposition that Dr. Socol and "another lady" pushed on Hilaria's stomach for either 5 to 10 minutes or 15 to 20 minutes.

Laura Mahlmeister testified for plaintiffs as an expert in nursing care. Mahlmeister testified that the nurses who cared for Hilaria starting at approximately 4:45 p.m. deviated from the nursing standard of care in: (1) failing to appropriately monitor the fetal heart rate pattern; (2) failing to quickly summon a doctor when problematic fetal heart rate tracings persisted; (3) failing to properly document and relieve problems with umbilical cord compression; (4) failing to discontinue the drug Pitocin under the circumstances and to summon doctors at that time; (5) failing to recognize the worsening decelerations between 5:20 to 5:45 p.m.; (6) failing to ask for the placement of an internal fetal heart rate monitor; (7) failing to push the emergency button at 6:10 p.m., failing to summon the charge nurse, attending physician and an anesthesiologist, and failing to prepare for a caesarian delivery; (8) failing to advocate for immediately moving Hilaria to the operating room when Dr. Socol and the charge nurse arrived between 6:12 and 6:27 p.m.; (9) failing to put an oxygen mask on Hilaria to hyperoxygenate her to oxygenate the baby; (10) failed to obtain additional medical consultation; and (11) failing to object to the application of fundal pressure (pressure to the abdomen), if it occurred.

On cross-examination, Mahlmeier testified that well-qualified doctors and nurses may disagree over the portions of a fetal monitor strip, but that there should not be disagreement as to its overall characteristics. Mahlmeier stated that benign or mild variable fetal heart rate deceleration is very common in labor. Mahlmeier testified that she could not say with absolute certainty that fundal pressure was applied in this case. Mahlmeier testified that cases of uterine rupture are rare and unpredictable and that the cause of the uterine rupture in this case was not clear. Mahlmeier testified that there was no evidence in this case of persistent uterine hyper-

stimulation. Mahlmeier stated that she would defer to the opinion of a pediatric neurologist as to the cause of death in this case.

Dr. Paul Gatewood, an obstetrician, also testified for plaintiffs. After initially overruling a defense objection, the trial court halted a line of questions based on Mahlmeier's opinions based on Sullivan v. Edward Hospital, 209 Ill. 2d 100 (2004), which upheld a trial court's decision to bar the testimony of a physician regarding alleged nursing negligence as undisclosed under Supreme Court Rule 213. Following a sidebar conference, Dr. Gatewood was permitted to testify that, hypothetically, if Mahlmeier had testified that certain deviations from the nursing standard of care had occurred, they would have caused harm to Hilaria and Giselle.

Dr. Gatewood later testified that there would have been neurological damage before the uterine rupture, but that the primary wrong in this case was that fundal pressure ruptured the uterus and created profound hypoxia in the baby. Dr. Gatewood testified that the beginning of the uterine rupture may have occurred as early as 6:07 p.m.; it was his opinion that the uterine rupture occurred at approximately 6:48 to 6:51 p.m. Dr. Gatewood testified that he did not have an opinion as to the cause of death in this case. Dr. Gatewood also testified that he would defer to the opinion of a pediatric neurologist and neonatalist as to the cause of injury. Dr. Gatewood testified that he could not say for sure whether Giselle suffered brain damage from hypoxia before the rupture.

Dr. Steven Albern, the plaintiffs' expert pediatric neurologist, testified that the baby was injured by hypoxic-ischemic encephalopathy (HIE), which is a caused by a lack of oxygen, blood pressure and blood flow to the brain. Dr. Albern testified that the infant suffered HIE at least an hour before the caesarian delivery, but after an extended sidebar conference, that testimony was stricken by the trial court on Rule 213 grounds. Dr. Albern testified that HIE can be caused by

compression of the umbilical cord, the placenta dislodging from the uterine wall, and uterine rupture. Dr. Albern testified that Giselle acquired HIE from the fact that her mother's uterus burst and she was found floating in the abdomen. Dr. Albern agreed that the HIE was a direct cause of death in this case.

The defendants moved for a directed verdict at the close of the plaintiffs' case. The trial court took the motion under advisement, pending the submission of a written motion and any response from plaintiffs.

Yarra Torres Anderson testified that she was the charge nurse on duty on December 25, 1999. Anderson testified that she monitored Hilaria's contractions and Giselle's fetal heart rate pattern throughout the day from the nurses' report room and did not see anything unusual about them before entering Hilaria's room. Anderson testified that the fetal heart rate strips were reassuring until 6:54 p.m., when Hilaria was taken to an operating room for a possible caesarian delivery. Anderson testified that she did not use fundal pressure on Hilaria and did not see anyone else do so. Anderson testified that she did touch Hilaria's abdomen to check for contractions.

Elisa Torres testified that she was Hilaria's primary nurse on December 25, 1999, beginning at 7:45 a.m. Torres testified that she volunteered to be assigned to Hilaria because she always volunteered to care for Spanish-speaking parents. Torres testified that she stayed with Hilaria as her only patient from 9:25 a.m. onward, except for an hour break at 3:55 p.m.

Torres testified that she did not observe anything unusual until approximately 6 p.m., when the fetal heart rate pattern showed variable decelerations requiring resuscitative measures. Torres testified that she gave a fluid bolus at 5:45 p.m., often repositioned Hilaria, turned off the Pitocin at 6:10 and administered oxygen at 6:42 p.m. Torres denied using any fundal pressure,

but stated that she gently palpitated Hilaria's abdomen to see that the uterus was relaxing between contractions.

Dr. Chan, a board-certified obstetrician and gynecologist, testified that she was a third-year resident on the date in question. As such, she was qualified to perform all tasks that an attending obstetrician and gynecologist would perform, but was required to be supervised by the attending physician. Dr. Chan testified that Hilaria did not present any of the typical risk factors for uterine rupture. Dr. Chan testified that there was nothing concerning about Hilaria's condition until 6 p.m. Dr. Chan testified that Hilaria's cervix was dilated nine centimeters and that while a cervix is not considered completely effaced until it reaches 10 centimeters, it is not uncommon for a woman who has given birth before to dilate from 9 to10 centimeters in a minute and deliver shortly thereafter.

Dr. Chan testified that there was a significant fetal heart rate deceleration at 6:07 or 6:08 p.m., but that the heart rate quickly recovered to about 90 beats per minute, which was reassuring, but below normal. Dr. Chan and the nursing staff took resuscitative measures. Dr. Chan discontinued the Pitocin. The fetal heart rate was then in the 150s, which is considered normal for a mother who is pushing. Dr. Chan testified that it was not appropriate to administer Terbutaline to relax the uterus where, as here, the doctors still anticipated a vaginal delivery. Dr. Chan testified that she was with Hilaria from 6:07 p.m. onward and did not see anyone apply fundal pressure.

Hilaria was completely dilated at 6:35 p.m. Dr. Chan testified that she and Dr. Socol decided to take Hilaria to the operating room. The doctors set up an external monitor, then an internal scalp monitor and found the fetal heart rate "flat lining" in the 60s, whereupon they

immediately performed a caesarian delivery. Dr. Chan testified that she met the applicable standard of medical care in this case.

Dr. Ernie Graham, a high-risk obstetrician and assistant professor in maternal fetal medicine at Johns Hopkins University, testified on behalf of defendants. Dr. Graham testified that the HIE was caused by the uterine rupture, which is rare and unpredictable. Dr. Graham testified that nothing the doctors and nurses did in this case caused or contributed to the uterine rupture. Dr. Graham opined that the variable decelerations between 6:07 p.m. and the delivery did not indicate hypoxic injury because the fetal heart rate would recover to a normal baseline. Dr. Graham opined that there was no evidence that fundal pressure had been applied.

Kathryn Cavanaugh testified over objection as a nursing expert for Northwestern. Cavanaugh testified that the nursing care Hilaria received complied with the standard of care and that no intervention was required prior to 6 p.m. Cavanaugh also opined that there was no evidence that fundal pressure had been applied.

Dr. Sara Kilpatrick, a board-certified maternal fetal medicine specialist, testified that both Drs. Socol and Chan met the standard of care for reasonably well-qualified obstetricians and gynecologists in this case.

Dr. Socol, a board-certified obstetrician and gynecologist, with a subspecialty in maternal fetal medicine, testified that he had been on the Northwestern staff since 1979. In December 1999, he was a professor of obstetrics and gynecology, vice-president of the obstetrics and gynecology department at Northwestern's medical school, and chief of obstetrics at the hospital. In 1995-96, he served on a committee studying electronic fetal monitoring for the National Institutes of Health, specifically the clinical significance and management of variable decelerations.

His testimony was largely similar to that of Dr. Chan with respect to Hilaria's course of treatment. Dr. Socol also testified that at 6:35, when Hilaria was completely dilated, delivery was expected to occur in another 10 to 20 minutes. Hilaria was taken to an operating room at 6:53 p.m. Dr. Socol discovered the ruptured uterus as soon as he made the incision for the emergency caesarian delivery. The rupture and attendant blood loss required Dr. Socol to perform an emergency hysterectomy to save Hilaria's life. Dr. Socol opined that the final uterine rupture that expelled the fetus into the abdomen occurred a few minutes before delivery, as would be consistent with the dramatic change the fetal heart rate tracing. Dr. Socol opined that the rupture was a rare event and that nothing he or anyone else did caused or contributed to it.

At the close of testimony, the trial court considered and denied plaintiffs' motions to strike Cavanaugh's testimony and for a directed verdict against Northwestern. The trial court then considered defendants' joint motion for a directed verdict, granting it in part and denying it in part. The trial court ruled that, with the exception of the fundal pressure issue, the plaintiffs' experts did not connect the alleged deviations from the standards of care proximately caused damages to Hilaria or Giselle. The jury instructions were revised to conform to this ruling.

Following closing arguments, the jury deliberated and returned a verdict in favor of the defendants. Plaintiffs filed a posttrial motion, which the trial court denied. Plaintiffs now appeal.

I

Plaintiffs first argue that the trial court erred in directing a verdict in favor of defendants on the issues of negligence other than the alleged application of fundal pressure. "A directed verdict in favor of a defendant is appropriate when the plaintiff has not established a prima facie case." Sullivan v. Edward Hospital, 209 Ill. 2d 100, 123 (2004). "A plaintiff must present at

least some evidence on every essential element of the cause of action or the defendant is entitled to judgment in his or her favor as a matter of law." Sullivan, 209 Ill. 2d at 123. Accordingly, the standard of review is de novo. Sullivan, 209 Ill. 2d at 112.

The primary cause of action alleged in this case was medical malpractice. Thus, the plaintiffs must establish that it is more probably true than not true that the defendant's negligence was a proximate cause of the injury. Borowski v. Von Solbrig, 60 Ill. 2d 418, 424 (1975). The proximate cause element of a medical malpractice case must be established by expert testimony to a reasonable degree of medical certainty. Northern Trust Co. v. University of Chicago Hospitals & Clinics, 355 Ill. App. 3d 230, 242 (2004).

Plaintiffs note that they presented testimony from Mahlmeier as to a variety of ways in which the nursing staff deviated from the appropriate standard of care. Plaintiffs note that Dr. Gatewood testified that, hypothetically, if the aforementioned deviations occurred, there was a reasonable degree of medical probability that they caused injury to Hilaria and Giselle. Defendants respond that plaintiffs failed to establish that the injury referred to in this testimony was an injury plaintiffs alleged and sued upon.

Initially, we note that plaintiffs' brief does not discuss the issue in terms of the malpractice claims brought by Hilaria and the alleged damages to her. As for the injury to Giselle, Dr. Gatewood testified that she suffered from a neurological deficit related to the HIE. Dr. Gatewood also testified that every baby undergoes some degree of hypoxia as a result of the birthing process and that he could not say for sure whether Giselle suffered brain damage from hypoxia before the rupture. Dr. Gatewood further testified--consistent with his prior deposition-- that as to the cause of injury, he would have some deference to the opinion of the pediatric

neurologist and neonatologist. Dr. Gatewood agreed that the HIE was caused by the uterine rupture, though that it was "really beyond [his] purview" because he was not a neurologist.

Dr. Albern testified that HIE can be caused by compression of the umbilical cord, the placenta dislodging from the uterine wall, and uterine rupture, but that Giselle acquired HIE from the fact that her mother's uterus burst and she was found floating in the abdomen.[2]

In sum, the record showed that Giselle's injuries were caused by the HIE that resulted from the uterine rupture. Thus, for a theory based on a particular deviation from the standard of care to survive a motion for directed verdict, plaintiffs were required to produce evidence that the particular deviation was a proximate cause of the uterine rupture.

Plaintiffs argue that the trial court erred by refusing to consider purported admissions of Dr. Chan as evidence of deviation from the standard of care. However, even assuming for the sake of argument that this was true, plaintiffs would still be required to produce evidence that the purported deviations were a proximate cause of the HIE caused by the uterine rupture. Plaintiffs' brief contains no citations to any such testimony on causation.

Plaintiffs argue that "[i]t appears that the trial court based its decision on its refusal to allow Dr. Albern to testify as to the timing of the injury, in addition to Dr. Gatewood." Plaintiffs refer to the Rule 213 objection to Dr. Albern testifying that Giselle suffered HIE at least an hour before the delivery. Decisions of the trial court on the admission of evidence will not be disturbed absent an abuse of discretion. Foley v. Fletcher, 361 Ill. App. 3d 39, 46 (2005). A

---

[2] Although not necessary to dispose of the appeal, we note that appellants' counsel stressed at oral argument that it is crucial to have a pediatric neurologist opine on the cause of injury in catastrophic birth cases.

court abuses its discretion when no reasonable person would agree with the decision. Skubak v. Lutheran General Health Care Systems, 339 Ill. App. 3d 30, 36 (2003).

The purpose of discovery rules, governing the "timely disclosure of expert witnesses, their opinions, and the bases for those opinions is to avoid surprise and to discourage strategic gamesmanship." Thomas v. Johnson Controls, Inc., 344 Ill. App. 3d 1026, 1032 (2003). Supreme Court Rule 213 disclosures are mandatory and strict compliance is required. Sullivan, 209 Ill. 2d at 109. Rule 213(f)(3) requires parties to furnish, among other things, the subject matter, conclusions and opinions of controlled expert witnesses who will testify at trial. 210 Ill. 2d R. 213(f)(3). Rule 213(g) limits expert opinions at trial to "[t]he information disclosed in answer to a Rule 213(f) interrogatory, or at deposition." 210 Ill. 2d R. 213(g). A witness may elaborate on a disclosed opinion as long as the testimony states logical corollaries to the opinion, rather than new reasons for it. Barton v. Chicago & North Western Transportation Co., 325 Ill. App. 3d 1005, 1039 (2001). Such testimony must be encompassed by the original opinion. Prairie v. Snow Valley Health Resources, Inc., 324 Ill. App. 3d 568, 576 (2001). A party's Rule 213 disclosures must "drop down to specifics." Sullivan, 209 Ill. 2d at 109. While it is improper for a trial court to allow previously undisclosed opinions that advance a new negligence theory (Clayton v. County of Cook, 346 Ill. App. 3d 367 (2003)), an opinion is not new merely because it refers to a more precise time than given in the expert's Rule 213 disclosure (Seef v. Ingalls Memorial Hospital, 311 Ill. App. 3d 7, 23 (1999)).

It does not logically follow, however, that an opinion as to a precise time is never a new opinion. Dr. Albern testified in his deposition that the injury occurred during the intrapartum period, but could not give an exact hour. Such an answer left open the possibility that Dr. Albern might opine that the injury occurred more than an hour prior to delivery. However, the record

also shows that Dr. Gatewood testified that the uterus ruptured due to the application of fundal pressure. The record shows that Dr. Gatewood testified that the process of the rupture could have begun as early as 6:08 p.m, but that terminal bradycardia started at approximately 6:50 p.m. Thus, for Dr. Albern to opine that Giselle suffered HIE <u>at least</u> an hour before delivery could reasonably be seen as introducing a theory into the case that was not only previously undisclosed, but also contrary to the theory presented by Dr. Gatewood. Moreover, Dr. Albern testified at trial that he was not there to testify to any deviation from the standard of care or whether anyone's action or omission was a cause of injury. Given this record, the trial court did not abuse its discretion in excluding that piece of Dr. Albern's testimony suggesting the HIE was caused by an event at least one hour prior to delivery.

In sum, while plaintiffs presented evidence that the nursing staff--and the doctors-- deviated from the applicable standards of care in this case, the plaintiffs were required to establish that the purported deviations proximately caused the injuries at issue. Plaintiffs presented evidence that Giselle's HIE was the result of the uterine rupture. Plaintiffs presented expert testimony that the uterine rupture was caused by fundal pressure. The trial court, in entering a directed verdict, allowed the fundal pressure theory to go to the jury, but not other theories, because plaintiffs presented no proper expert testimony linking any of the other alleged deviations from the standards of care to the uterine rupture. Thus, the trial court did not err in directing the verdict in part for defendants and modifying the jury instructions accordingly.

## II

Plaintiffs argue that the trial court erred in allowing Kathryn Cavanaugh to testify as an expert witness. The determination of whether a licensed medical professional is qualified to

testify as an expert in a malpractice action is generally a matter resting within the sound discretion of the trial court. Rosenberg v. Miller, 247 Ill. App. 3d 1023, 1029 (1993).

The record on appeal shows that plaintiffs moved to disqualify Cavanaugh on the day of her testimony, following two days of argument on other motions in limine. That motion and plaintiffs' brief rely on a version of section 8-2501 of the Illinois Code of Civil Procedure that was declared unconstitutional in Best v. Taylor Machine Works, 179 Ill. 2d 367 (1997).

The record shows that Cavanaugh testified that, as director of patient care for Little Company of Mary Hospital in Evergreen Park, she spent approximately 60% of her time on administrative duties. Plaintiffs' motion asserted that Cavanaugh spent 40% of her time as an expert witness; the record shows only that Cavanaugh estimated that 40% of her income derives from acting as an expert witness. Cavanaugh testified that the cases she took in were reviewed outside of her regular work. Cavanaugh testified that she had been consistently involved in labor and delivery nursing since 1973. Her responsibilities included overseeing labor and delivery. Cavanaugh testified that she had daily contact with the labor and delivery floor. That daily contact included talking to the nurses, helping and answering questions for them, and interpreting strips for them. Cavanaugh stated that in emergencies, she has also admitted and taken over the care of patients. Cavanaugh testified that she participated in an emergency caesarian section delivery in the week before her testimony. She had also been involved in delivering babies during the month prior to her testimony.

Plaintiffs' argument is that a medical professional who holds an administrative position cannot be considered to be in "active practice" under section 8-2501. Plaintiffs, however, cite no authority for that proposition as a matter of law. Nor does the record compel that conclusion as a matter of fact in this case. Plaintiffs have not shown that no reasonable person would have

allowed Cavanaugh's testimony. The trial court did not abuse its discretion in allowing the testimony. The trial court did not err in denying plaintiffs' motion for a directed verdict.

III

Plaintiffs next contend that the trial court incorrectly ruled on a number of objections at trial, thereby depriving plaintiffs of a fair trial. Defendants argue that most or all of these objections are waived due to plaintiffs' failure to properly raise them in either the posttrial motion or on appeal. A posttrial motion must contain a "simple, succinct statement of the factual or legal basis" for the litigant's belief that the trial court erred. E.g., Brown v. Decatur Memorial Hospital, 83 Ill. 2d 344, 350 (1980); Hampton v. Sears Roebuck & Co., 252 Ill. App. 3d 744, 752-53 (1993). "A party may not urge as error on review of the ruling on [his] post-trial motion any point, ground, or relief not specified in the motion." 155 Ill. 2d R. 366(b)(2)(iii). Moreover:

> "Argument, which shall contain the contentions of the appellant
> and the reasons therefor, with citation of the authorities and the
> pages of the record relied on. Evidence shall not be copied at
> length, but reference shall be made to the pages of the record on
> appeal or abstract, if any, where evidence may be found. Citation
> of numerous authorities in support of the same point is not favored.
> Points not argued are waived and shall not be raised in the reply
> brief, in oral argument, or on petition for rehearing." 210 Ill. 2d R.
> 341(e)(7); see 210 Ill. 2d R. 341(h)(7).

When an appellant seeks reversal, theories presented without authority are deemed waived, and the reviewing court should not search the record for reasons to reverse the trial court's judgment. A reviewing court is entitled to have the issues clearly defined with pertinent authority cited and

is not simply a depository into which the appealing party may dump the burden of argument and research. E.g., Crawford County State Bank v. Grady, 161 Ill. App. 3d 332, 342 (1987) (and cases cited therein). Almost all of plaintiffs' evidentiary contentions on appeal fail to comply with these rules, but this court turns to consider them briefly.

Plaintiffs first argue that the trial court improperly allowed Hilaria to be questioned using her prior deposition, which was purportedly consistent and nonimpeaching. The record shows that plaintiffs objected to the form of the question, arguing that Hilaria was not asked about the time and place of her prior deposition, though the transcript shows she already had been asked about the circumstances of her March 17, 2003, deposition. Moreover, Hilaria's trial testimony that she had nothing but pain since the operation seems inconsistent with her deposition testimony that she had no medical problems.

Plaintiffs next assert that the trial court erred in allowing defense counsel to lead their witnesses in violation of a motion in limine. A new trial may be granted for a violation of an in limine order only if the order's prohibitions are specific, the violation is clear, and the violation deprived the moving party a fair trial. Kwon v. M.T.D. Products, Inc., 285 Ill. App. 3d 192, 198 (1996). Plaintiffs fail to identify where the trial court's order in limine may be found in either the transcript or as a written order, which is preferable. See Stennis v. Rekkas, 233 Ill. App. 3d 813, 825 (1992). Plaintiffs also devote an entire section of their brief to asserting that the trial court improperly denied their motions in limine and improperly granted defendants' motions in limine. However, aside from the standard of review, plaintiffs cite no legal authority. Plaintiffs cite to the pages in the record where the motions may be found without reference to any ruling or order, or any transcript of same. Accordingly, these issues are waived.

Plaintiffs assert that the trial court erred in permitting redirect examination beyond the scope of cross-examination, but cite no legal authority.

Plaintiffs assert that the trial court erred in refusing to allow redirect examination of Dr. Gatewood on the occlusion of the umbilical cord and the drop in pH values, without stating any factual or legal argument to support the assertion. Plaintiffs also assert that the trial court erred in refusing to allow redirect of Dr. Gatewood on the predictive value of fetal heart rate monitoring strips, but the record citation provided is to cross-examination, not to a denial of redirect.

Plaintiffs then assert that the trial court erred in sustaining defense objections to cross-examination of Dr. Graham regarding risk factors for uterine rupture, including hyperstimulation of the uterus, and instructing the jury that hyperstimulation was not an issue. The record shows that the objection was sustained for lack of foundation and that plaintiffs' counsel was unable to cite any evidence that hyperstimulation was a proximate cause of injury in this case.

Plaintiffs next assert that the trial court improperly limited the cross-examination of Dr. Socol regarding his prior expert testimony in other medical malpractice cases, particularly his knowledge of the use of fundal pressure. Plaintiffs' counsel, however, cites to no testimony by Dr. Socol denying knowledge of the procedure. Rather, Dr. Socol denied that fundal pressure was used in this case. The trial court sustained a defense objection on relevancy grounds. A sidebar followed, during which plaintiffs' counsel asserted that Dr. Socol was the only person in the room who would even have known what fundal pressure was. The trial judge disagreed and warned plaintiffs' counsel that if he insinuated that Dr. Socol had given prior inconsistent expert testimony, it would lead to a mistrial. The transcript reflects an admission by plaintiffs' counsel that Dr. Socol had never testified in favor of the use of fundal pressure. Plaintiffs' counsel

makes no showing that Dr. Socol's trial testimony would have been shown to be false. Moreover, the record shows that medical opinion on the propriety of using fundal pressure has changed over time. Thus, plaintiffs have failed to show that the trial court erred on this point.

Plaintiffs next assert that the trial court improperly limited the cross-examination of Dr. Socol about a purported admission in his deposition that the issue about care of the plaintiff(s) was the last hour of care. Plaintiffs fail to cite any legal authority; the record citation provided contains no ruling on the issue. The argument is waived.

Plaintiffs next assert that the trial court erred in sustaining an objection to recross-examination of Dr. Socol regarding his decision-making process while watching the heart rate fluctuations before moving to a caesarian delivery. However, the sole case cited, People v. Keefe, 209 Ill. App. 3d 744 (1991), addresses the right of a criminal defendant to testify regarding his state of mind when presenting the defense of self-defense. Keefe is inapposite to this case.

Plaintiffs next assert that the trial court erred in allowing defense counsel to ask questions designed to impeach without a contrary answer having been given. Plaintiffs fail to provide the underlying factual basis for the argument or cite any legal authority, resulting in waiver on appeal.

Plaintiffs assert that the trial court improperly allowed defense counsel to question Dr. Albern as to whether he, in his personal practice, had suggested that other obstetricians had failed to deliver babies properly. Plaintiffs did not raise this issue in their posttrial motion, resulting in waiver on appeal.

Plaintiffs then assert that the trial court erred in refusing to permit redirect of Dr. Albern on the issue of pH as an outcome. The transcript shows that this involved a Rule 213 issue. Plaintiffs cite no legal authority in support of their assertion of error.

Plaintiffs assert that the trial court allowed the defense to cross-examine Dr. Gatewood with a text called Creasy & Resnick, but refused to allow plaintiffs to use it. The record shows that plaintiffs' counsel withdrew an objection to the use of Creasy & Resnick and did not object to the use of a text by Freeman & Garite. The record also shows that plaintiffs were able to use a text to cross-examine Dr. Kilpatrick with only one objection to the form of one question. Plaintiffs' counsel was not permitted to cross-examine Dr. Graham on hyperstimulation of the uterus, but (as noted above) the issue was relevancy, not the use of the treatise.

Plaintiffs fail to cite any legal authority for their next five contentions of error concerning: an interruption of cross-examination of defense expert Sarah Kilpatrick as to which texts she considered authoritative; sustaining a defense objection to questioning Dr. Chan about a purported discrepancy between her deposition and trial testimony; sustaining the defense objection to the question as to the percentage of Kilpatrick's income that derived from acting as an expert witness; sustaining a defense question as to whether having Hilaria push would impinge on the blood flow to the baby; and sustaining a defense objection to characterizing the fetal heart rate was not flat when the tracing was discontinued to take Hilaria to the operating room.

Plaintiffs assert that the trial court erred in refusing to allow plaintiffs to question Dr. Gatewood on redirect about the length of time to reach 6.95 pH and what the pH must have been at birth. Plaintiffs assert that defense counsel opened the door on cross-examination, but fail to cite to where defense counsel opened the door.

IV

Plaintiffs next argue that the misconduct of defense counsel deprived them of a fair trial in several ways. Plaintiffs first argue that counsel for Northwestern and Dr. Chan falsely stated in his opening statement that the evidence would show a placental abruption and later cross-examined Dr. Albern on the subject. Plaintiffs did not object to either at trial, thereby waiving the argument. Moreover, plaintiffs' nursing expert testified there was a placental abruption in this case. Furthermore, during closing argument, defense counsel admitted his mistake to the jury.

Plaintiffs argue that counsel for Northwestern and Dr. Chan asked Dr. Gatewood to hypothetically assume facts not yet in evidence, but the fact was later agreed to by Dr. Gatewood. Plaintiffs argue that counsel for Northwestern and Dr. Chan falsely claimed that the jury could not read or understand fetal monitoring strips, and that he was unable to read them. Plaintiffs fail to provide a record citation for this, resulting in waiver. Counsel for Northwestern and Dr. Chan provided a record citation to the opening statement, which shows that plaintiffs did not object to the statement (which, in context, was that the jury was going to hear a great deal of evidence from medical professionals as to the interpretation of these strips).

Plaintiffs also claim the trial court improperly overruled objections to counsel for Northwestern and Dr. Chan attacking the credibility of a witness and making argument in the opening statement. Plaintiffs provide a 25-page record citation without identifying the specific portions relied upon, resulting in waiver. See Mikrut v. First Bank of Oak Park, 359 Ill. App. 3d 37, 51-52 (2005). Plaintiffs took the same approach to arguing that the closing argument by counsel for Northwestern and Dr. Chan was filled with histrionics, but ultimately citing and quoting only the conclusion of that argument, to which plaintiffs did not object at trial.

19

Plaintiffs also argue that counsel for Dr. Socol deliberately inserted argument and hearsay into his opening statement. Plaintiffs note that objections were sustained as to some of the comments, but concede that they failed to object to others, none of which are specified in plaintiffs' brief, resulting in waiver.

V

Plaintiffs argue that the trial court deprived them of a fair trial by telling jokes, informing the jury of a trial schedule, limiting the time for closing arguments, and by showing anger toward plaintiffs' counsel within earshot of the jury. The trial judge, as the dominant figure in the courtroom, should exercise caution and avoid making statements which could prejudice the jury against or in favor of a party. Oldenburg v. Hagemann, 207 Ill. App. 3d 315, 323-24 (1991); Heiser v. Chastain, 6 Ill. App. 3d 552, 557 (1972). Ordinarily, a trial judge should avoid extensive questioning of a witness. Goshey v. Dunlap, 16 Ill. App. 3d 29, 31 (1973). However, if the questioning is done in a fair and impartial manner, the judge may inquire of a witness in order to elicit the truth or to clarify obscure issues. In re Custody of Horbatenko, 176 Ill. App. 3d 970, 974 (1988). "Although a trial judge has the power to admonish or rebuke a party or counsel for misconduct ***, any rebuke in the presence of the jury should not exceed the bounds of necessity and care must be taken even then to admonish in a manner which will not deprive either party of a fair trial." Pavilon v. Kaferly, 204 Ill. App. 3d 235, 254 (1990). Where a party is persistently disruptive and contemptuous of the rules of conduct, it may become intensely difficult, but not necessarily impossible, for the trial judge to meet the duties of maintaining both order and the appearance of neutrality. Pavilon, 204 Ill. App. 3d at 254. A new trial will be granted on the basis of a judge's remarks or conduct only if the remarks or conduct result in prejudice to a party.

Vinke v. Artim Transportation System, Inc., 87 Ill. App. 3d 400, 412 (1980); Crump v. Universal Safety Equipment Co., 79 Ill. App. 3d 202, 210 (1979).

In this case, plaintiffs cite two instances of the trial court allegedly losing its temper. The first of these concerned the sidebar on the motion to disqualify Cavanaugh as an expert. As previously noted, plaintiffs' counsel moved to disqualify Cavanaugh on the day of her testimony, following two days of argument on other motions in limine, offering no excuse for the last-minute nature of the motion or for being late to court that morning, with the witness ready to testify. The trial judge stated that he was upset and acknowledged that the jury could be heard laughing in the jury room. But the record does not show that the trial judge raised his voice or that the jury's laughter was related to the sidebar. Plaintiffs assert that the trial judge stated that he wanted the record to show that the jury could hear him, but provide no record citation for that statement.

The second instance is the sidebar regarding plaintiffs' counsel's attempt to cross-examine Dr. Socol regarding his prior expert testimony. Plaintiffs' counsel noted for the record that the trial judge was raising his voice within earshot of the jury and that it was the second time the judge had done so. The trial judge replied that he was happy for counsel to note it and that it was at least the second time it had occurred. Plaintiffs' counsel omits that this exchange occurred after the trial court had already admonished plaintiffs' counsel for previously introducing objectionable material on the subject, plaintiffs' counsel had asserted that Dr. Socol was the only person involved in the case who knew what fundal pressure was, and the trial judge had admonished plaintiffs' counsel for improperly attempting to leave the jury with the impression that Dr. Socol had previously given expert testimony supporting the use of fundal pressure. Although it would have been preferable had the trial judge not raised his voice, the record as a

whole tends to suggest that the trial judge believed it necessary to maintain order. Plaintiffs fail to show that the incident prejudiced their rights to a fair trial.

We also note that on page 44 of plaintiffs' brief, counsel attributed a statement of defense counsel to the trial judge and offered it as proof of bias.

Plaintiffs assert that the trial court sustained defense objections during plaintiffs' rebuttal argument in an angry manner. The record on appeal does not indicate whether there was an angry tone. Plaintiffs' counsel specifies the trial judge's question to him, was "Are you finished?" The record shows that this question immediately followed plaintiffs' counsel stating to the jury, "Under these circumstances, I will thank you for your time." The trial court asked the question, to which plaintiffs' counsel replied that he was almost finished, then concluded his argument.

Plaintiffs assert that the trial court erred by informing the jury of a trial schedule and then limiting the time for closing arguments, but cite no legal authority, resulting in waiver.

Plaintiffs assert that the trial court erred in telling jokes about rooting for the Chicago Cubs or the White Sox on two occasions, but cites no legal authority and offers no factual argument as to how these jokes deprived plaintiffs of a fair trial.

Plaintiffs assert that the trial court erred in making joking references to the *Seinfeld* television program. The transcript shows that the trial court used the reference to lightly admonish Dr. Socol that he was being a "fast talker." Plaintiffs argue in their brief that there is no place for levity in a case involving the death of an infant. Although a trial judge must ensure that the jury is not given the impression that such a case is to be taken lightly, the judge is also charged with ensuring that witnesses can be heard and understood by both the jury, counsel and the court reporter. It is not uncommon for a witness, including a defendant, to be nervous on the witness stand. Judicial admonishment of the witness regarding the speed or volume of their

22

testimony, particularly in a case as serious as this one, may have the paradoxical effect of making the witness more nervous. Thus, it was not reversible error for the judge to admonish the witness as he did.

Plaintiffs claim that the trial judge accused the plaintiffs' counsel of "unfairness" in front of the jury, but the record citation contains no such statement. Thus, the argument is waived.

VI

Plaintiffs argue that the trial court erred by asking plaintiffs' attorneys if he could meet privately with defense counsel "for settlement purposes," failing to make a record of the conversation and never disclosing the contents of the conversation to plaintiffs' counsel. Plaintiffs, however, agreed to the trial judge's request. A party cannot complain of error to which that party consented. E.g., In re Detention of Swope, 213 Ill. 2d 210, 217 (2004).

Plaintiffs also argue that the trial judge failed to disclose a prior personal relationship with counsel for Dr. Socol or his partner, which deprived plaintiffs of the opportunity to move for a substitution of judge. In the transcript quoted by plaintiffs, the trial judge stated that he knew Mr. Quandt and that he had a number of cases in the judge's courtroom. Plaintiffs rely on an electronic search of cases tried to verdict, but Mr. Quandt has cited a case he tried before the trial judge that settled prior to a verdict.

VII

Finally, plaintiffs argue that the trial court's errors collectively deprived them of a fair trial. However, plaintiffs have failed to show individual or collective reversible error in this case.

For all of the reasons above, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

QUINN, P.J., and MURPHY, J., concur.