# Illinois Official Reports

## Appellate Court

---

**The Northern League of Professional Baseball Teams v. Gozdecki, Del Giudice, Americus & Farkas, LLP**, 2018 IL App (1st) 172407

---

| | |
|---|---|
| Appellate Court Caption | THE NORTHERN LEAGUE OF PROFESSIONAL BASEBALL TEAMS, d/b/a The Northern League, Plaintiff-Appellant, v. GOZDECKI, DEL GIUDICE, AMERICUS & FARKAS, LLP, and STEVEN LEECH, Defendants-Appellees. |
| District & No. | First District, Sixth Division<br>Docket No. 1-17-2407 |
| Filed | December 28, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 12-L-4748; the Hon. Marguerite A. Quinn, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Siprut, PC, of Chicago (Joseph J. Siprut and Richard S. Wilson, of counsel), for appellant.<br><br>Hinshaw & Culbertson LLP, of Chicago (Peter D. Sullivan, Barry F. MacEntee, and Adam R. Vaught, of counsel), for appellees. |
| Panel | JUSTICE HARRIS delivered the judgment of the court, with opinion. Presiding Justice Delort and Justice Cunningham concurred in the judgment and opinion. |

**OPINION**

¶ 1        Plaintiff, The Northern League of Professional Baseball Teams (plaintiff or Northern League), appeals the circuit court's judgment entered in favor of defendants, Gozdecki, Del Giudice, Americus & Farkas, LLP, and Steven Leech, after a jury trial on plaintiff's legal malpractice claim. On appeal, plaintiff contends that a new trial is warranted where the court below (1) improperly allowed witnesses to testify that they would not have signed a contract containing an exit fee provision; (2) improperly barred as hearsay testimony that an attorney told the witness an attempt to enforce the expulsion provision in the league agreement would be futile; (3) erroneously found that plaintiff failed to disclose all of the league agreements its expert relied on in his opinion; (4) erred in finding that defendants' expert witnesses were qualified to testify as experts in this case; (5) gave jury instructions that precluded the jury from finding defendants liable for legal malpractice and improperly allowed defendants to argue that plaintiff waived its legal malpractice claim where it entered into a settlement agreement with defendants; and (6) erroneously submitted special interrogatories to the jury that were misleading, confusing, and substantially prejudicial to plaintiff. For the following reasons, we affirm.

¶ 2                                    JURISDICTION
¶ 3        The trial court entered a final judgment upon the jury's verdict on May 9, 2017. Plaintiff filed a motion for judgment notwithstanding the verdict or a new trial, which the trial court denied on September 26, 2017. Plaintiff filed a notice of appeal that same day. Accordingly, this court has jurisdiction pursuant to Illinois Supreme Court Rules 301 (eff. Feb. 1, 1994) and 303 (eff. July 1, 2017), governing appeals from final judgments entered below.

¶ 4                                    BACKGROUND
¶ 5        The following facts are relevant to the issues on appeal. Plaintiff, organized as a South Dakota corporation in 1993, operated as an independent baseball league unaffiliated with major league baseball. Independent leagues field their own teams, sign their players, and govern themselves. Plaintiff filed its legal malpractice action against defendants on May 2, 2012. In its first amended complaint, plaintiff alleged that defendants failed to include a damages provision in the league agreement that would impose $1 million in liquidated damages on teams that voluntarily withdrew from the league. Plaintiff alleged that Gary, Kansas City, Fargo, and Winnipeg gave notice that they would depart the league after the 2011 season to join a rival association, and as a result of defendants' malpractice, plaintiff did not receive compensation "upon the mass exodus of fifty percent of the League's membership." The departures caused plaintiff to suffer devastating financial losses and eventually, the league ceased operations. Plaintiff sought as compensatory damages "the $4 million that the Northern League should have been able to collect from" the departing teams, but for defendants' malpractice. During the time period relevant to the lawsuit, plaintiff was comprised of these four teams, as well as teams from Joliet, Lake County, Rockford, and Schaumburg.

¶ 6        At the trial, Richard Ehrenreich, a lawyer and owner of the Schaumburg and Lake County teams, testified that in 1993, plaintiff "never had any real competition" and "[t]eams weren't leaving the Northern League to go anywhere because there weren't any other independent leagues." By 2005, however, other leagues had come into existence so plaintiff's teams began

to discuss the concept of exit fees, which would require exiting teams to pay an amount as liquidated damages.

¶ 7    As the league started having these discussions, 4 of plaintiff's 12 teams left the league. According to Ehrenreich, the exit fee discussions "may have been what sped up those four teams leaving that year. They didn't want to have to deal with that in a league agreement." Ehrenreich testified that after the four teams left, the remaining league members "were panicking" because they "didn't see it coming." They determined that the league agreement should have an exit fee provision. Ehrenreich drafted an addendum to the league agreement (the Agreement of Eight), and all of the remaining teams signed the agreement. The Agreement of Eight provided as follows:

"Any Team that voluntar[ily] terminates its membership in the Northern League for any reason shall reimburse the remaining Teams for all damages caused by such departure. It is acknowledged that the exact amount of damages suffered by the remaining Teams will be difficult to proof [*sic*] or ascertain, and therefore, the terminating Team shall pay to the remaining Teams as liquidated damages the sum of $2 million or the Current Membership Expansion Fee, whichever is greater."

¶ 8    In 2007, the Calgary and Edmonton teams left the league. Ehrenreich testified that plaintiff filed suit against them based on the Agreement of Eight exit fee provision. While the suit was pending, the Gary team was sold to attorney Pat Salvi. Salvi offered to take the case against Calgary and Edmonton on a contingency fee basis so the league could save money. Steven Leech, an associate at Salvi's firm, sent an e-mail to the league's board informing them that he "would be one of the attorneys principally responsible for pursuing the case against Calgary and Edmonton."

¶ 9    Ehrenreich testified that some time in 2009, Salvi advised the board to settle the suit. They "didn't ask a lot of questions" because they "were getting ready to start a season. It was just kind of a nuisance at that point ***." Ehrenreich did not remember much about the situation, only that the defendants were "very litigious" and had threatened counterclaims against plaintiff. Also, "there were procedural matters involved, problems with the lawsuit *** and we were provided with a settlement agreement." Pursuant to the agreement, Calgary and Edmonton did not pay any money, but they did return their stock.

¶ 10    In January 2009, plaintiff looked for outside counsel to assist in changing its structure. Leech, who now worked with the firm of Gozdecki & Del Giudice, LLP, offered his services. Plaintiff retained Leech and the firm to draft a new league agreement. Ehrenreich testified that the owners never discussed "doing away with an exit fee provision altogether," and Leech was not told to "do[ ] away" with the fee. To keep attorney fees low, the league's commissioner, Clark Griffin, provided Leech with a first draft of the agreement. This draft did not contain a liquidated damages/exit fee provision. Leech submitted his first draft in March 2009. His draft also did not contain an exit fee provision. Instead, it provided for expulsion on eight grounds, which required a two-thirds vote of disinterested directors. Upon expulsion, a team is liable for liquidated damages in the amount of $2 million. Leech's e-mail also included a draft of a separate membership agreement, which new members would be required to sign upon entering the league. This agreement did contain an exit fee provision that stated that if a new team "ceases to operate as a League professional baseball team or operates as a professional baseball team in a different league," that team would pay $2 million as liquidated damages. Ehrenreich

testified that in his mind, an exit fee differs from an expulsion fee in that "an exit fee should be automatic. If a team leaves, they pay the money."

¶ 11    On June 4, 2009, Leech had discussions with the owner of the Fargo team, Bruce Thom. Thom had concerns about the $2 million liquidated damages provision and indicated that he did not want to sign with that provision but "would be very open to discussing some other type of provision to deter teams from bolting the league." Soon after, Leech sent an e-mail to the board members detailing his discussions with Thom. In the e-mail, Leech provided suggestions including reducing the current $2 million fee and providing for a notice period to allow a team to find a replacement franchise. Leech stated, however, that ultimately the procedure and price to exit "is a business decision that must be made by the team owners." Leech had a conference call with the owners and afterwards circulated a second draft of the agreement. In the second draft, the liquidated damages due upon expulsion was reduced to $1 million.

¶ 12    After various discussions with the owners, including Ehrenreich, Leech circulated a fifth and final draft of the league agreement. This draft was substantially the same as the first draft circulated in March, except that the liquidated damages provision for expulsion was reduced from $2 million to $1 million. The draft also did not contain an exit fee provision. As an owner, Salvi testified that he would not have agreed to an automatic exit fee provision because it was important that a liquidated damages provision be triggered "only if you had a hearing and an opportunity to make your case, and only if two thirds of the disinterested directors voted to expel. That was crucial." Owner Katz also testified that he would not have signed an agreement containing an automatic exit fee provision.

¶ 13    League commissioner Griffin reviewed the agreement and e-mailed Leech that "the docs are fine." Representatives from the remaining six teams executed the league agreement on July 7, 2009. Ehrenreich stated that, prior to signing, he reviewed a draft of the agreement and noted the changes other teams wanted to make, but he "didn't reread a 16-page document five times when the[ ] drafts were sent out." Ehrenreich made his comments and "just signed it once we had a final document." On cross-examination, Ehrenreich acknowledged that he reviewed Leech's first draft, which did not contain an exit fee provision, but he did not ask Leech to change the draft. To his knowledge, none of the other owners asked Leech to change the expulsion provision.

¶ 14    In August 2009, new teams from Lake County and Rockford joined the league. Ehrenreich, who owned the Schaumburg team, also owned the new Lake County team. However, when the Rockford team was presented with the membership agreement, which imposed a $2 million exit fee if the team left the league, Rockford refused to sign. Therefore, the membership agreement was amended to provide that if Rockford left the league, it agreed to pay damages as set forth in the league agreement's expulsion provision.

¶ 15    Due to financial issues, plaintiff began negotiations in 2010 with the American Association, another independent baseball league, for possible interleague play or for a merger. Plaintiff hired attorney Tim Haffner to represent it in the negotiations. The owners, however, could not come to a unanimous agreement on whether to accept the proposed one year trial merger/affiliation with the American Association. At some point, the Joliet, Schaumburg, Lake County, and Rockford teams began separate negotiations with teams from the Frontier League to form a new league in the Chicago area. Haffner attempted to have plaintiff's members reach an amicable separation agreement wherein Winnipeg, Fargo-

Moorhead, Gary, and Kansas City could go with the American Association, and Joliet, Rockford, Schaumburg, and Lake County could join the Frontier League or form a new entity. The agreement provided that all parties would retain their Northern League ownership rights, and that "no party would take the position that anyone violated the Northern League agreement triggering the $1,000,000 liquidation damage clause." Although Rockford and Joliet indicated they would sign the agreement, Schaumburg and Lake County refused to enter into any separation agreement.

¶ 16    Salvi's son, Patrick Salvi II, was retained as the attorney for Winnipeg, Gary, Kansas City, and Fargo. On September 29, 2010, Salvi II sent a letter to Joliet, Rockford, Schaumburg, and Lake County, outlining his clients' position that they are not abandoning the Northern League and have fully preserved their rights and interests in the league. It was also their position that "the actions of Joliet, Schaumburg, Lake County and Rockford has [*sic*] caused this disruption in the Northern League operations." In response, Martin Greenberg sent an e-mail on October 11, 2010, stating that he has "been retained by the Northern League" and wanted to know "whether Winnipeg, Fargo, Kansas City and Gary *have accepted* the invitation to join the American Association." (Emphasis in original.) Greenberg reminded Salvi II that the liquidated damages provision in the league agreement for expulsion was "legally enforceable" against the departing teams.

¶ 17    A couple of days later, Salvi II sent an e-mail disputing that Greenberg represented the league and stated that Greenberg only represented Joliet, Rockford, Schaumburg, and Lake County, as the remaining teams were still part of the league. Salvi II disagreed with Greenberg's implication that Salvi II's teams would be liable for the liquidated damages set forth in the league agreement. Instead, it was the position of his clients that Joliet, Rockford, Schaumburg, and Lake County "are in breach of the Northern League Agreement." Salvi II noted that all members of the league approved of negotiations with the American Association and that the negotiations "were completely transparent to all members of the Northern League." In contrast, "[t]he concurrent negotiations with the Frontier League by Joliet, Lake County, Rockford, and Schaumburg were not transparent and meant these clubs were engaged in negotiations with the American Association in bad faith." He stated that if Joliet, Lake County, Rockford, and Schaumburg had been dealing with the Frontier League without the involvement of the other members, this conduct was "in serious detriment to the Northern League, for if the American Association merger negotiation had not been taking place, the Gary, Kansas City, Fargo, and Winnipeg clubs would have been left in the Northern League with only four teams remaining in the league." Salvi II again stated his position that his teams "have not resigned from the Northern League."

¶ 18    The parties entered into a settlement agreement on November 1, 2010. The teams exchanged a mutual release of all claims they may have against each other, and no money was exchanged between the parties. Ehrenreich testified that the teams were concerned they would not be able to play ball in the upcoming season if the case proceeded. Other leagues informed them that they would be considered for membership only if they "first settled with these departing teams because they didn't want to be in the middle of the lawsuit." Ehrenreich testified that they chose to settle in order to play during the 2011 season. He stated, however, that "[i]f we had an exit fee, we would have filed a lawsuit against the departing teams and made a legal attempt to collect the exit fee." When asked whether plaintiff could have filed a lawsuit or for arbitration against Winnipeg, Gary, Kansas City, and Fargo, based on the

- 5 -

existing agreement, Ehrenreich answered that "we could have thrown money at it, but we were told it was a loser" from "what we were advised by lawyers." He stated that they did look into enforcing the league agreement's expulsion fee provision against the teams, and they hired a lawyer, but his understanding was that they "didn't have the number of directors. We didn't have a quorum. We only had three directors."

¶ 19    Robert Leib testified as plaintiff's expert at trial. Leib, who also is a certified public accountant and was a worldwide partner at Arthur Andersen, taught sports law at Marquette University for three years. He has worked in the sports and entertainment industries for over 30 years, advising clients in the areas of finance and tax. He developed a significant business working with major and minor league sports teams and published books on major and minor league leases. The trial court found him qualified to testify as an expert "with the following limitations":

> "[D]efense contends that the plaintiff has not disclosed various league agreements as a basis for Leib's opinion and they allege that nondisclosure is a violation of Rule 213(f)(3). And what I'm referring to here is the footnote, it's referred to by all the parties as footnote eight in the plaintiff's motion in opposition to defendant's motion *in limine* No. 17. *** On April 14th, plaintiffs filed a motion in opposition to defendant's motion *in limine* No. 17. There is a footnote in that motion listing 11 baseball league agreements that reportedly Mr. Leib relied upon in formulating his expert opinion ***.

> The subject agreements contained in footnote eight were never specifically disclosed in any of those documents. During his deposition, *** Mr. Leib specifically named five league agreements in reference to the subject exit fee provisions, none of which are contained in footnote eight. The plaintiff's 213(f)(3) disclosures are similarly silent regarding those 11 agreements contained in footnote eight. ***

> This court disagrees that 213(f)(3) only requires a general disclosure of documents or an all-encompassing statement of documents by the witness that throughout his career he has seen and worked on many professional sports league and team organizational legal structure. *** The defense requested the interrogatory and it wasn't until the eve of trial that the defense was informed, specifically informed of the significance of those 11 agreements listed in footnote 8.

> It is this Court's opinion that the defense is absolutely prejudiced by this omission and, therefore, Mr. Leib will be barred from testifying about those 11 agreements."

The court also barred Leib from testifying based on certain paragraphs contained in his second affidavit, which was disclosed 14 days prior to trial, because that information did not merely set forth logical corollaries of his previously disclosed general opinions. It found that "[t]he defense would be prejudiced at this late date by new opinions expressed therein."

¶ 20    Leib testified that an "automatic trigger" was needed because otherwise, no process exists to levy damages or sanctions on a team that is "just not go[ing] to play in the league," which would result in "a somewhat chaotic situation." Leib explained that "[t]he strength of a league is in the stability and continuity of its member teams" and one way to provide that stability is "to create a deterrence for anybody leaving the league which can damage the league and in some cases be catastrophic to the league." Leib testified that having an expulsion provision like the one here is not enough. Instead, what is needed in an agreement is an exit provision with an automatic trigger. He stated that in reviewing league agreements in "the IHL, MISL, MSL,

Texas league, and Australian Football league," he never saw an expulsion provision "standing alone. The idea is if you're going to have an expulsion provision, there is a companion provision providing for an automatic exit or sanction based on the voluntary action of the member team. They are in tandem somewhere in the league operating agreement."

¶ 21 Leib concluded that in his opinion, "the defendants displayed a lack of experience and demonstrated a complete inability to provide the Northern League with a validly executed exit clause that would be automatically triggered on the departure of, in this case, four member teams." The failure "to provide the league with that kind of language in an executed agreement fell below the standard of care expected of an Illinois attorney."

¶ 22 Defendants presented the testimony of two expert witnesses. Peter Carfagna graduated from Harvard University and also from Harvard Law School, and completed a masters degree at Oxford University. Currently, he is chairman and chief executive officer (CEO) of Magis, LLC, a sports marketing, consulting, and investment firm. He has lectured at Harvard on sports law and authored three books on representing clients in the sports industry. He also worked for 10 years as the chief legal officer and general counsel at IMG, a prominent sports and entertainment agency. The trial court noted that Carfagna "has negotiated and supervised the drafting of contracts and the encompassing issues for various athletic teams, owners, athletes and investors." Although plaintiff objected to Carfagna as an expert because he lacks experience with independent baseball leagues, the trial court determined that his qualifications do not depend "on whether he is a member of the same specialty or subspecialty as the defendant, but rather whether the allegations of negligence concern matters within his knowledge and observations." The trial court found Carfagna qualified to testify as an expert witness.

¶ 23 Carfagna testified that each league "has its own governance documents." He disagreed with Leib's opinion that it is common practice for such documents to "contain liquidated damages provisions triggered by a single type of action." Rather, his experience with league governance documents is that they contain no such liquidated damages provision. Carfagna testified that each league document must be "individually negotiated," and if the owners wanted to have an automatic exit fee provision, they could have it because "[t]hat's what the owners vote on is things like that." He stated that when Leech was drafting the league agreement, his conduct in documenting his conversations with the owners and responding with options was consistent with the standard of care expected of him. Leech should not be dictating which provisions to include in the agreement because that is a business decision for the owners. Carfagna concluded that based on his experience and review of other league governance documents, Leech's work satisfied the applicable standard of care.

¶ 24 On cross-examination, Carfagna stated that he took into account the prior history of the Northern League in forming his opinions but had no opinion on whether team stability is essential for the survival of an unaffiliated league. He also acknowledged that none of the e-mails that were exchanged between Leech and the owners expressly stated that the expulsion provision in the new agreement would replace the exit fee provision in the Agreement of Eight.

¶ 25 Gary Leydig also testified as an expert witness for defendants. For the past 35 years he has represented businesses, entrepreneurs, and not-for-profits in commercial transactions and disputes. He has extensive experience litigating contract matters, including liquidated damages clauses. The trial court noted that plaintiff objected to Leydig as an expert because he lacks experience in sports law, specifically baseball league contracts. After noting that Leydig's

expertise could be addressed in cross-examination and the jury will weigh his testimony accordingly, the trial court deemed Leydig qualified to testify as an expert in the case.

¶ 26 Leydig testified that liquidated damages provisions "in general are very common. They exist in all kinds of contracts." In his practice, he has seen such provisions, and also has drafted and reviewed them. From his experience, Leydig is familiar with the law relating to liquidated damages clauses. Based on his experience in drafting contracts and his review of the documents in this case, Leydig disagreed with Leib's conclusion that Leech or his firm breached the standard of care. Leech communicated with the owners and based his drafts on that communication. Leech did not "go off on a tangent" or do "something he was not supposed to do." Leech "shared [his work] with the clients repeatedly. The clients talked about it, they exchanged about it, and it became quite clear to me that not only had he in the first instance done what he was asked to do, but that then was cemented, in effect, by the clients reading it and confirming that there were no problems with what he did." Leydig concluded that Leech's work met the standard of care. On cross-examination, Leydig acknowledged that he had no experience in sports law, nor had he ever drafted a sports league agreement.

¶ 27 After deliberations, the jury rendered a verdict in favor of defendants. Plaintiff filed a motion for judgment notwithstanding the verdict or a new trial, which the trial court denied. Plaintiff filed this timely appeal.[1]

¶ 28                                    ANALYSIS
¶ 29                            I. Evidentiary Rulings
¶ 30 Plaintiff challenges numerous evidentiary rulings made by the trial court. Generally, evidence is admissible if it has a tendency to make the existence of any consequential fact more or less probable than without the evidence. *Smith v. Silver Cross Hospital*, 339 Ill. App. 3d 67, 73-74 (2003). The relevance of evidence is a matter within the sound discretion of the trial court and a reviewing court will not disturb the trial court's determination absent an abuse of discretion. *Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 92 (1995). An abuse of discretion occurs where no reasonable person would take the view of the trial court. *In re Leona W.*, 228 Ill. 2d 439, 460 (2008). Even if error occurs, reversal is not warranted unless the error resulted in "substantial prejudice affecting the outcome of the trial." *Id.*

¶ 31                    A. *Testimony of Owners Salvi and Katz*
¶ 32 Plaintiff argues that the trial court erred in admitting the testimony of owners Salvi and Katz, who stated they would not have signed an agreement containing an exit fee provision. We must consider the relevance of this testimony to determine whether error occurred. See *Brown v. Advocate Health & Hospitals Corp.*, 2017 IL App (1st) 161918, ¶ 12 (finding that pursuant to the rules of evidence, "all relevant evidence generally is admissible, and evidence that is not relevant is not admissible").

¶ 33 To prevail on a legal malpractice claim, plaintiff must prove that (1) defendants owed plaintiff a duty of due care arising from the attorney-client relationship, (2) defendants

---

[1]Defendants argue that plaintiff lacks standing to bring claims against defendants but cites no authority in support of their position. A bare contention that fails to cite any authority is waived for consideration on appeal. *Olive Portfolio Alpha, LLC v. 116 West Hubbard Street, LLC*, 2017 IL App (1st) 160357, ¶ 42.

committed a negligent act or omission constituting a breach of that duty, and (3) the breach proximately caused damages to plaintiff. *Tri-G, Inc. v. Burke, Bosselman & Weaver*, 222 Ill. 2d 218, 225-26 (2006). The right to recovery is premised on the fact that a plaintiff "would have been compensated for an injury caused by a third party, absent negligence on the part of [plaintiff's] attorney." *Id.* at 226. Therefore, "[e]ven if negligence on the part of the attorney is established, no action will lie against the attorney unless that negligence proximately caused damage to the client." *Id.* To demonstrate proximate cause, "plaintiff is required to prove that but for the attorney's negligence, the plaintiff would have been successful in that underlying action. A legal malpractice plaintiff must therefore litigate a 'case within a case.' " *Id.*; see also *Orzel v. Szewczyk*, 391 Ill. App. 3d 283, 290 (2009).

¶ 34       In its amended complaint for legal malpractice, plaintiff alleged that defendants breached their standard of care when they failed to include an automatic $1 million exit fee provision in the league agreement, and as a result, plaintiff suffered a loss of $4 million when four teams left the league. Thus, in order to establish its case within a case, plaintiff must show that it would have prevailed against the departing teams on an agreement containing an automatic exit fee provision. Accordingly, plaintiff must establish that the owners in the league would have agreed to such a provision in the league agreement. See *King Koil Licensing Co. v. Harris*, 2017 IL App (1st) 161019, ¶ 64 (finding that although the attorney may have been negligent in drafting an incorrect "Total Annual Sales" definition in the contract, in finding in favor of the attorney the jury could have determined that his negligence did not proximately cause damages where there was "lack of any proof" that the other party would have agreed to the correct definition). Testimony from a witness who was a party to a contract can be crucial evidence of that party's intent as to the terms of the contract. See *Cambridge Engineering, Inc. v. Mercury Partners 90 BI, Inc.*, 378 Ill. App. 3d 437, 451 (2007).

¶ 35       Although the owners wanted the new agreement to contain some sort of "cessation of operations" damages provision, the type of fee the owners intended, whether an automatic exit fee provision or the expulsion provision actually contained in the contract, was vigorously contested between the parties at trial. Ehrenreich testified that he had drafted the Agreement of Eight, which had an automatic exit fee provision, to provide some stability in the league. He further testified that when the league wanted a new agreement, the owners never discussed "doing away with an exit fee provision altogether," and Leech was not told to "do[ ] away" with the fee. However, Ehrenreich's testimony also indicated that the league encountered problems when it tried to enforce an automatic exit fee provision in the past. The owner of the Fargo team, Thom, had concerns about the $2 million liquidated damages provision and indicated that he did not want to sign with that provision, but "would be very open to discussing some other type of provision to deter teams from bolting the league." Salvi's and Katz's testimony would have made the existence of the proximate cause element of plaintiff's claim more or less probable than without the evidence. As such, the evidence was relevant, and the trial court did not abuse its discretion in admitting their testimony.

¶ 36       Plaintiff, however, argues that the trial court erred in allowing evidence showing that Salvi and Katz would not have signed a league agreement containing an exit fee provision because no such agreement existed at the time. Therefore, any testimony as to what they would have done in that situation violates Illinois Rules of Evidence 602 and 701 (eff. Jan. 1, 2011). Plaintiff argues that these rules, which require that a witness's opinion be based on personal

knowledge or the perception of the witness, do not allow testimony based on such speculation. As support, plaintiff relies on *Linton v. Chicago Motor Club, Inc.*, 192 Ill. App. 3d 813 (1989).

¶ 37     In *Linton*, the plaintiff argued that she was entitled to a reformation of her insurance policy, where she claimed that she would have sought additional uninsured/underinsured coverage if she had been fully informed of the costs and benefits. *Id.* at 818. This court disagreed, finding that whether she would have chosen the increased coverage was speculative where she had "rejected bodily injury liability insurance in the same amount in which she now seeks" uninsured/underinsured coverage. *Id. Linton* did not involve Rules 602 or 701, nor did the court consider the relevancy of plaintiff's testimony that she would have sought more coverage. The court merely found the plaintiff's arguments unconvincing because they consisted of self-serving speculation and were contradicted by the record. See *id.*

¶ 38     *Linton* is inapposite. Neither *Linton* nor the other cases plaintiff cites as support involve the relevancy of testimony regarding a disputed provision in a contract. The intent of the parties regarding the propriety of a provision is "clearly relevant in the formation of a contract." *Lundberg v. Church Farm, Inc.*, 151 Ill. App. 3d 452, 458-59 (1986). Here, to determine whether defendants committed malpractice by failing to include an automatic exit fee provision in the agreement, the jury had to consider the parties' intent regarding exit fees. Plaintiff has not cited any authority stating that evidence of such intent cannot be relevant or admissible just because the parties did not have an actual agreement containing the disputed provision. Of course, the jury is not required to believe Salvi's or Katz's testimony. However, the credibility of these owners, and the weight assigned to their testimony, is a matter left for the jury to determine. *Redmond v. Socha*, 216 Ill. 2d 622, 652 (2005).

¶ 39                    B. *Limitations on Ehrenreich's Testimony*

¶ 40     Plaintiff next argues that the trial court erred when it prevented Ehrenreich from testifying why plaintiff chose not to sue Gary, Kansas City, Fargo, and Winnipeg for liquidated damages under the agreement's expulsion provision. Specifically, Ehrenreich sought to testify about the legal advice attorney Greenberg gave concerning enforcement of the agreement and his understanding about what constituted a "quorum" under the agreement. The trial court found that this testimony constituted inadmissible hearsay and improperly encompassed legal conclusions.

¶ 41     Plaintiff contends that Ehrenreich's testimony regarding Greenberg's advice was not inadmissible hearsay because it was offered to show the effect on the listener, rather than for the truth of the matter asserted. See *People v. Kline*, 90 Ill. App. 3d 1008, 1012 (1980) ("[i]f the out-of-court statements are offered to prove the resultant effect of those words on the listener's state of mind, then the speaking of the words is independently relevant *** and the statements are admissible as non-hearsay"). Also, Ehrenreich should have been able to testify about Greenberg's advice, which "indicated that the meeting of remaining directors *** may not have constituted a 'quorum' because four of the seven directors did not participate in the meetings." Plaintiff argues that this advice "was a deciding factor in Plaintiff's choice to forego suing" for damages.

¶ 42     Even if the trial court erred in barring this testimony, Ehrenreich was able to relay the same information to the jury through other testimony. For example, he testified that plaintiff hired attorneys and based on their advice, plaintiff did not pursue claims against Gary, Kansas City, Fargo, and Winnipeg. At trial, when asked whether plaintiff could have filed a lawsuit or for

- 10 -

arbitration against Winnipeg, Gary, Kansas City, and Fargo, Ehrenreich answered that "we could have thrown money at it, but we were told it was a loser" based on "what we were advised by lawyers." Ehrenreich also testified that plaintiff looked into enforcing the league agreement's expulsion fee provision against the teams, and hired a lawyer, but his understanding was that they "didn't have the number of directors. We didn't have a quorum. We only had three directors." Since the barred testimony was cumulative to testimony that was presented at trial, any error that may have occurred was harmless. *Roberts v. Sisters of Saint Francis Health Services, Inc.*, 198 Ill. App. 3d 891, 902 (1990).

¶ 43    Plaintiff also contends that the trial court improperly limited Ehrenreich's testimony about what he would have done if the league agreement contained an automatic exit fee provision. Plaintiff argues that Ehrenreich "sought to testify about whether Plaintiff would have sued to recover liquidated damages from the Departing Owners, rather than agreeing to a 'walk-away' settlement, if the League Agreement contained an exit fee provision." Plaintiff contends that this testimony was necessary to rebut defendant's argument that plaintiff would have been in the same position, even with the exit fee provision, because the departing teams would have refused to pay the fee in this situation.

¶ 44    The following exchange occurred at trial as Ehrenreich testified:

"Q. Suppose that you had gotten the exit fee you wanted in the agreement, the one you're saying wasn't there. Wouldn't you have had the same Hobson's choice?

A. No.

Q. Why not?"

Defense counsel objected, and the trial court held a sidebar where the following occurred:

"MR. MILLER [PLAINTIFF'S ATTORNEY]: Your Honor, we filed a lengthy motion *in limine* asking that the defendants not be allowed to have team owners testify regarding what they would have done if a different provision had existed within the—had been drafted in the league agreement.

We fought that motion very hard. We lost that motion, and the Court said, you know what, I'm going to let people testify to what they would have done if the circumstances were different.

I think what's good for the goose is good for the gander. We're just asking Mr. Ehrenreich if the exit fee provision had been put in the agreement, that you say should have been in there, what would have happened. ***

MR. SIPRUT [PLAINTIFF'S ATTORNEY]: Plus one additional point. One of the main arguments they have made in this case since day one, and they are making it today, the league couldn't have collected the money from these guys anyway because even if the exit fee provision that we're complaining about was in there, the same thing could have happened. The departing teams could have said, forget it, we're not giving you anything. ***

All we're trying to do is respond to that by saying, why is that wrong? What would you have done if you had the exit fee? Why wouldn't it have been a Hobson's choice?"

¶ 45    Defendants' counsel objected, arguing Ehrenreich's answer that he would have pursued a lawsuit if the agreement had contained an exit fee provision called for him to give his opinion on a legal conclusion—whether the exit fee provision would have been enforceable, "among other factors." This exchange followed:

"MR. SIPRUT: The question of whether it is legally enforceable is one thing. The question that was asked of Mr. Ehrenreich *** in his capacity as a lay witness—

THE COURT: Correct.

MR. SIPRUT:—was don't you have a Hobson's choice. You're going to play baseball or you're going to sue. That sounds like a problem.

In his capacity as a layperson, [Ehrenreich] said, yeah, we have to play baseball. [Defendants' counsel's] argument is now going to be, well, no proximate cause.

THE COURT: In his capacity as a layperson what's he going to say to your question?

MR. SIPRUT: I'm going to say, in your capacity as a team owner, as a guy who knows nothing about sports law, by his own account, nothing, less than anyone in this room, don't you have the same problem even if you get this exit fee *** why do you think you don't have the same problem, Mr. Ehrenreich.

Answer, as a business owner, the decision I would make as a business owner is to sue. Even if that means not playing baseball we're going for it.

MR. MILLER: You cut him off, we'll cut him off, whatever.

THE COURT: I'm going to let just that in over your objection. Just that.

MR. SIPRUT: Thank you, Your Honor."

The proceedings continued in front of the jury, and the following exchange occurred between plaintiff's counsel and Ehrenreich as a witness:

Q. *** The question is, well, what if the agreement had the clause that you say is missing, this exit fee provision. Don't you have the same problem?

MR. SULLIVAN [DEFENDANTS' ATTORNEY]: Objection to form. Foundation. Speculative.

THE COURT: Overruled. He can answer. Do you understand the question.

A. I do. No, we don't have the same problem.

Q. Why?

A. If we had an exit fee, we would have filed a lawsuit against the departing teams and made a legal attempt to collect the exit fee.

Q. Why don't we just end it right there then. I didn't mean—I was making sure he didn't say anything more."

¶ 46    Plaintiff wanted Ehrenreich to testify that he would have sued the departing teams if the league agreement contained an exit fee provision, and that is what he testified to in court over defendants' objection. Although plaintiff contends that the trial court improperly limited Ehrenreich's testimony on this issue, plaintiff has not indicated what further statements Ehrenreich wanted to make. As the above exchange shows, the trial court asked plaintiff's counsel during the sidebar what he would like to ask Ehrenreich on the stand, and Ehrenreich's expected answer. The trial court allowed plaintiff's counsel to question Ehrenreich as counsel requested. We find no error here.[2] See *Lopez v. Northwestern Memorial Hospital*, 375 Ill.

---

[2]Plaintiff also argues that the trial court erred in admitting evidence of prior litigation involving Ehrenreich but does not identify that evidence or provide any analysis on why such evidence

- 12 -

App. 3d 637, 654 (2007) (finding that "[a] party cannot complain of error to which that party consented").

¶ 47          C. *Limitation of Plaintiff's Expert Leib's Testimony*

¶ 48    Plaintiff next contends that the trial court improperly limited the testimony of its expert, Leib. Plaintiff argues that Leib should have been allowed to testify regarding (1) all of the league agreements he relied on in forming his opinion, (2) the differences between affiliated and unaffiliated sports leagues, and (3) his experience teaching exit fees at Marquette University Law School. The trial court limited this testimony because plaintiff did not disclose the opinions, or the basis of the opinions, as required by Illinois Supreme Court Rule 213(f)(3) (eff. Jan. 1, 2007).

¶ 49    Rule 213(f)(3) provides that "[f]or each controlled expert witness, the party must identify: (i) the subject matter on which the witness will testify; (ii) the conclusions and opinions of the witness and the bases therefor; (iii) the qualifications of the witness; and (iv) any reports prepared by the witness about the case." *Id.* Rule 213 disclosures "are mandatory and strict compliance is required." *Lopez*, 375 Ill. App. 3d at 645. Furthermore, "[t]he information disclosed in answer to a Rule 213(f) interrogatory, or in a discovery deposition, limits the testimony that can be given by a witness on direct examination at trial." Ill. S. Ct. R. 213(g) (eff. Jan. 1, 2007). When a Rule 213 violation occurs, the imposition of sanctions is within the trial court's discretion, and a reviewing court will not disturb that determination absent an abuse of discretion. *Klingelhoets v. Charlton-Perrin*, 2013 IL App (1st) 112412, ¶ 38. The trial court abuses its discretion when no reasonable person would adopt the court's view. *Id.*

¶ 50    The trial court barred Leib from testifying about 11 particular league agreements he has seen throughout his career, which were disclosed in a footnote (footnote eight) contained in plaintiff's motion opposing defendants' motion *in limine*. The court found that these agreements "were never specifically disclosed" in documents identified or produced as a basis for Leib's opinion pursuant to Rule 213(f)(3). Leib's first affidavit, filed before he was deposed, only stated generally that he has "seen numerous league agreements relating to exit fee provision." At his deposition, Leib was asked "you state [that] in my experience exit fee provisions usually obligate a team that withdraws from a league to pay a certain sum ***. Which league agreements are you basing that opinion on?" The trial court noted that in his response, Leib "specifically named five league agreements in reference to the subject of exit fee provisions *** none of which are contained in footnote eight." Leib's second affidavit, filed after his deposition, did not clarify that he omitted agreements nor did he mention the 11 agreements contained in footnote eight. The trial court found that "it wasn't until the eve of trial that the defense was informed, specifically informed of the significance of those 11 agreements listed in footnote eight. It is this Court's opinion that the defense is absolutely prejudiced by this omission and, therefore, Mr. Leib will be barred from testifying about those 11 agreements."

¶ 51    Plaintiff, however, argues that this basis for Leib's opinion was timely disclosed. It argues that the first page of Leib's expert report states that he relied on "industry authority" and "review of other professional sports leagues and team organization and legal structure" in

---

substantially prejudiced plaintiff. Therefore, plaintiff has forfeited consideration of this issue on appeal. *Express Valet, Inc. v. City of Chicago*, 373 Ill. App. 3d 838, 854-55 (2007).

formulating his opinions. Also, in his first affidavit, Leib stated that the opinions in his expert report were based on his "years of experience in sports law" and "having seen numerous league agreements." Therefore, plaintiff concludes, "Leib's review of *all* of the league agreements he had encountered in his career in sports law was properly disclosed."

¶ 52　　We disagree. Rule 213 furthers the administration of justice by providing a degree of certainty in the trial process and eliminating a trial by "ambush." *Clayton v. County of Cook*, 346 Ill. App. 3d 367, 381 (2003). The rule requires stricter adherence to disclosure requirements so that litigants can construct their trial strategy based on the opinions of opposing experts. *Sullivan v. Edward Hospital*, 209 Ill. 2d 100, 109-10 (2004). Rule 213 also requires disclosure of the basis for a witness's opinion, as well as that opinion. *Chapman v. Hubbard Woods Motors, Inc.*, 351 Ill. App. 3d 99, 110 (2004). Generally, "catch-all" phrases that are not connected to a specific opinion, such as those cited by plaintiff, do not comply with Rule 213's requirements. *Id.*

¶ 53　　We find that the trial court did not abuse its discretion in barring Leib from testifying beyond the league agreements he had previously disclosed as the basis of his opinion. Leib's opinion on exit fees that is based on seven agreements is not the same as his opinion based on every league agreement he has seen throughout his career.[3] The latter opinion strongly implies that every league agreement contains an exit fee provision. Plaintiff acknowledges as much when it argues that Leib's testimony

> "as to how *every* league agreement for unaffiliated sports leagues he had seen over his long career contained an exit fee provision *** would have greatly bolstered Leib's credibility when he testified as to the ultimate issue in the case, *i.e.*, that Defendants breached the applicable standard of care by not including an exit fee provision in Plaintiff's League Agreement."

Defendants, who formulated their trial strategy based on Leib's disclosure of seven agreements as the basis of his opinion, would undoubtedly have been prejudiced by this new disclosure on the eve of trial.

¶ 54　　The trial court also barred, as a violation of Rule 213, Leib's opinion testimony on the difference between affiliated and unaffiliated sports leagues because it was first disclosed in his second affidavit, "a mere 14 days prior to the commencement of this trial." However, plaintiff argues that in his expert report Leib described the distinctions in the organizational structures of these leagues and the more specific statements contained in his affidavit constitute logical corollaries to his disclosed opinions. "A witness may elaborate on a disclosed opinion as long as the testimony states logical corollaries to the opinion, rather than new reasons for it." *Lopez*, 375 Ill. App. 3d at 645. The elaboration "must be encompassed by the original opinion." *Id.*

¶ 55　　Plaintiff wanted Leib to testify more fully that the organizational structure of unaffiliated leagues requires exit fee provisions while the structure of affiliated leagues renders such provisions superfluous. Essentially, the proposed testimony concerns differences in the ability of teams to unilaterally withdrawal from each league and the sanctions imposed for such conduct. Plaintiff, however, does not discuss how this testimony is a logical corollary of Leib's statements regarding the organizational structures and business models of each league. In this

---

[3]Although Leib disclosed five agreements during his deposition, the record shows that the trial court subsequently allowed him to testify based on seven agreements.

section of his report, Leib does not mention exit fee provisions or anything that would imply the need for unaffiliated leagues to require such provisions in order to prevent unilateral withdrawal. Leib also makes no statements regarding withdrawal from affiliated leagues and only generally states that, for affiliated leagues, the professional baseball agreement "provides sanctions for membership related breaches as well as disciplinary infractions."

¶ 56    Rule 213 requires "strict compliance" and therefore, " 'you have to drop down to specifics.' " *Sullivan*, 209 Ill. 2d at 109-10. As a result, we find that the trial court's decision to bar this testimony as a new opinion in violation of Rule 213 was not an abuse of discretion. Furthermore, plaintiff provides only general citations to authority to support its position on this issue, and cites no authority on the issue of Leib's testimony about his teaching experience on exit fee provisions. Plaintiff forfeits its argument where it does not comply with the requirements of Illinois Supreme Court Rule 341(h)(7) (eff. May 25, 2018) (requiring briefs to provide analysis with citations to authority).

¶ 57                    D. *Defendants' Expert Witnesses Leydig and Carfagna*

¶ 58    Next, plaintiff contends that the trial court erred in qualifying defendants' witnesses, Leydig and Carfagna, as experts. Plaintiff argues that Leydig has no experience practicing sports law or drafting liquidated damages clauses and Carfagna has no experience with unaffiliated sports leagues or in drafting contracts. A witness may testify as an expert "if his experience and qualifications afford him knowledge that is not common to laypersons, and where his testimony will aid the trier of fact in reaching its conclusions." *Thompson v. Gordon*, 221 Ill. 2d 414, 428 (2006). No predetermined formula exists for how an expert acquires specialized knowledge, and one can gain such knowledge or experience through practical experience, scientific study, education, training, or research. *People v. Coleman*, 205 Ill. App. 3d 567, 584 (1990). Whether an individual is an expert on a particular subject is a determination within the sound discretion of the trial court. *Thompson*, 221 Ill. 2d at 428-29.

¶ 59    Leydig has represented businesses, entrepreneurs, and not-for-profits in commercial transactions and disputes for the past 35 years. He has extensive experience litigating contract matters, including liquidated damages clauses. Carfagna graduated from Harvard University and also from Harvard Law School and completed a masters degree at Oxford University. He is chairman and CEO of Magis, LLC, a sports marketing, consulting, and investment firm, has lectured at Harvard on sports law, and has authored three books on representing clients in the sports industry. He worked for 10 years as the chief legal officer and general counsel at IMG, a prominent sports and entertainment agency. Carfagna has negotiated and supervised the drafting of contracts for various athletic teams, owners, athletes, and investors.

¶ 60    The trial court noted plaintiff's objections to Leydig and Carfagna as expert witnesses. The court found, however, that both witnesses' expertise could be addressed in cross-examination and, indeed, plaintiff's counsel extensively challenged the qualifications and opinions of both experts on cross-examination. As the trial court stated, it is then left to the jury to weigh their testimony accordingly. See *Iaccino v. Anderson*, 406 Ill. App. 3d 397, 402 (2010) ("an expert's testimony is to be judged by the rules of weight and credibility applied to all other witnesses" (internal quotation marks omitted)). Furthermore, an expert's qualification does not depend "on whether he is a member of the same specialty or subspecialty as the defendant but, rather, whether the allegations of negligence concern matters within his knowledge and observation." *Jones v. O'Young*, 154 Ill. 2d 39, 43 (1992). The core issue here is whether defendants were

negligent in failing to include an exit fee provision in the league agreement, and Leydig has extensive experience in contract matters and liquidation clauses while Carfagna has broad experience in both the sports law and contracts. The trial court did not abuse its discretion in qualifying them to testify as expert witnesses.

¶ 61                    E. *Admissibility of Leydig's and Carfagna's Testimony*

¶ 62        Plaintiff also challenges the admission of portions of Leydig's and Carfagna's testimony at trial. First, plaintiff contends the trial court erred in allowing Leydig to testify that (1) departing owners would have refused to pay any exit fees, (2) Ehrenreich understood and approved the provision in the agreement that tied liquidated damages to expulsion instead of withdrawal, and (3) the opinions of plaintiff's expert Leib were not well-founded. Regarding the first statement, plaintiff does not cite the page in the record where this testimony can be found in violation of Rule 341(h)(7), and thus, plaintiff has forfeited this argument. See *Velocity Investments, LLC v. Alston*, 397 Ill. App. 3d 296, 297 (2010). Plaintiff provides citations to the record for the second and third statements, but we have not found this testimony on the cited pages. Instead, these pages refer to the parties' discussion of jury instructions and defendants' motion for a directed verdict. The supreme court rules "are not merely suggestions, but are necessary for the proper and efficient administration of the courts." *Walters v. Rodriguez*, 2011 IL App (1st) 103488, ¶ 5. This court "will not sift through the record or complete legal research" to support an argument, and issues that are "insufficiently presented do not satisfy the rule[s] and are considered waived." *Id.* ¶ 6. We note that plaintiff makes the same arguments about the second and third statements as to Carfagna. For the same reasons, these contentions are also waived.

¶ 63        Plaintiff also contends that during Leydig's cross-examination, the trial court improperly barred plaintiff's counsel from posing a hypothetical regarding (1) the total revenues of all of the league's member teams and (2) the total number of people employed by the member teams. An expert may state an opinion on a hypothetical question as long as the assumptions are supported by circumstantial or direct evidence in the record. *Carter v. Johnson*, 247 Ill. App. 3d 291, 297 (1993). The facts assumed in the hypothetical need not be undisputed, and the party posing the hypothetical may utilize only the facts in evidence as he perceives them. *Id.* The admissibility of expert testimony is within the sound discretion of the trial court, and this court will not disturb the trial court's determination absent an abuse of discretion. *Id.* at 297-98. The trial court abuses its discretion in refusing a hypothetical where the record contains sufficient evidence to support the hypothetical. See *Granberry v. Carbondale Clinic, S.C.*, 285 Ill. App. 3d 54, 60 (1996) (finding the trial court abused its discretion and should have allowed plaintiffs' counsel to ask a hypothetical where there was sufficient evidence in the record to support it).

¶ 64        Plaintiff has not sufficiently presented this issue for review where its brief makes no argument regarding the evidence at trial that supported the hypotheticals. Instead, plaintiff's brief states only that the question was "relevant because it would have elicited Leydig's opinion regarding whether Defendants met the standard of care by having a fifth year associate, who had never before drafted a sports league agreement, draft from scratch a league agreement for a *multi-million dollar* organization," (emphasis in original) and concludes, without analysis, that the hypothetical would not be more prejudicial than probative. We

cannot determine from plaintiff's argument whether the record contains sufficient evidence to support giving the hypotheticals.

¶ 65    Defendants' brief, however, provides this pertinent information. According to defendants, "Plaintiff wanted to pose a hypothetical that the teams in the league employed 900 people and had revenue between $12 million and $18 million per year." The only evidence about the number of people employed came from Ehrenreich, who testified that he employed about 150 people. The trial court sustained defendants' objection to the 900 employees in the hypothetical because there was no evidence showing how many people the other teams employed. However, the court found that four owners testified about their annual revenue and allowed plaintiff to pose a hypothetical based on that testimony. In fact, plaintiff did pose a standard of care hypothetical based on $8 million in revenue "for half the teams in the league." We find no error here.

¶ 66    Regarding Carfagna, plaintiff argues that the trial court erred in allowing him to testify that sports league governance documents do not uniformly address termination provisions. Plaintiff contends that since Carfagna had never seen an automatic exit fee provision in a league agreement, and has no experience with independent leagues, his opinion on the subject matter was based on speculation. Plaintiff argues it was severely prejudiced by Carfagna's testimony, which conflicted with Leib's conclusion that exit fee provisions are standard for independent sports leagues and critical for league stability.

¶ 67    Again, plaintiff's citations to the record for Carfagna's testimony here are incorrect—the pages refer to Leydig's testimony at trial—so this court does not know the precise testimony plaintiff objects to and, thus, cannot fully evaluate plaintiff's contention of error. Furthermore, whether Carfagna has ever seen an exit fee provision in a league agreement or has experience with independent leagues are factors that go to the weight of his testimony rather than its admissibility. See *In re V.Z.*, 287 Ill. App. 3d 552, 564 (1997). "The weight to be assigned to an expert opinion is for the jury to determine in light of the expert's credentials and the factual basis of his opinion." *Wiegman v. Hitch-Inn Post of Libertyville, Inc.*, 308 Ill. App. 3d 789, 799 (1999). Where conflicting expert testimony is presented at trial, it is the jury's duty as the trier of fact to resolve that conflict. *Hallowell v. University of Chicago Hospital*, 334 Ill. App. 3d 206, 212-13 (2002). The mere fact that the opposing experts at trial presented conflicting testimony is not sufficient to overturn a jury's verdict. Rather, this situation "involved a classic battle of the experts." (Internal quotation marks omitted.) *Snelson v. Kamm*, 204 Ill. 2d 1, 36 (2003). The jury needed to hear this evidence and "use its best judgment to determine where the truth could be found." (Internal quotation marks omitted.) *Id.* The trial court did not abuse its discretion in admitting this testimony.

¶ 68                              II. Jury Instructions and Special Interrogatories

¶ 69    Plaintiff next argues that the trial court gave erroneous jury instructions on the legal construction of a contract, waiver, and agency. Jury instructions must convey the correct principles of law applicable to the evidence presented at trial. *People v. Mohr*, 228 Ill. 2d 53, 65 (2008). As long as some evidence exists in the record to justify an instruction, "it is within the trial court's discretion to determine which issues are raised by the evidence and whether an instruction should be given." *Id.* Our standard of review is abuse of discretion. *Id.* at 66.

¶ 70    Plaintiff argues that the trial court erred in giving a non-Illinois Pattern Jury Instruction (non-IPI) on the legal construction of a contract. Plaintiff contends that the instruction resolved

a core issue of the case for the jury, whether defendants' negligent drafting of the agreement resulted in ambiguities and conflicts to plaintiff's detriment, by informing the jury that the agreement contained no conflicting provisions. A trial court must use an Illinois Pattern Jury Instruction (IPI) in a civil case, if applicable, considering the facts and the prevailing law. However, if the instruction "does not accurately state the law, the court may instruct the jury pursuant to a nonpattern instruction." *Schultz v. Northeast Illinois Regional Commuter R.R. Corp.*, 201 Ill. 2d 260, 273 (2002). The trial court abuses its discretion in giving a non-IPI instruction where, taken as a whole, it does not fairly, fully, and comprehensively apprise the jury of the relevant legal principles. *Id.* at 273-74. A reviewing court "will not reverse a trial court for giving faulty instructions unless they clearly misled the jury and resulted in prejudice to the appellant." *Id.* at 274.

¶ 71    To make our determination, we must first consider whether an IPI could have been given that accurately states the law. *Id.* Plaintiff, however, does not provide an IPI instruction the trial court should have given instead, nor has plaintiff indicated whether it tendered this instruction at trial. Plaintiff has forfeited this issue on appeal where it did not tender an instruction at trial. *People v. Tannenbaum*, 82 Ill. 2d 177, 180 (1980).

¶ 72    In any event, the non-IPI instruction given by the trial court conveyed the correct principles of contract law applicable to the evidence presented at trial. Plaintiff presented testimony that the general quorum provision of the agreement conflicted with the expulsion provision, thereby precluding the league from enforcing the expulsion provision. The trial court instructed the jury that, "When construing a contract such as the league agreement, the contract should be read so as to give effect to all provisions wherever possible. In addition, when two clauses of a contract conflict, the more specific clause should apply." This instruction was clear and accurately stated the prevailing law. See *Mayfair Construction Co. v. Waveland Associates Phase I Ltd. Partnership*, 249 Ill. App. 3d 188, 200 (1993) (stating that "[i]n construing a contract, it is presumed that all provisions were inserted for a purpose, and conflicting provisions will be reconciled if possible so as to give effect to all of the contract's provisions"); *American Federation of State, County & Municipal Employees v. Illinois State Labor Relations Board*, 274 Ill. App. 3d 327, 337 (1995) (finding that "in construing a contract, courts must give effect to the more specific clause and, in so doing, should qualify or reject the more general clause as the specific clause makes necessary"). The trial court did not abuse its discretion in giving this instruction.

¶ 73    Plaintiff also argues that the trial court erred in giving an instruction that described waiver as "an intentional relinquishment of a known right, which may be express or implied from the conduct of the plaintiff who is alleged to have waived this right." Plaintiff contends that this instruction did not "highlight the necessity of the right being *known* to the party and *intentionally* relinquished." (Emphases in original.) Plaintiff proposed an instruction that to find waiver, the jury must "find that: (1) the Plaintiff had a right to pursue a legal malpractice claim against the Defendants that could be waived; (2) the Plaintiff had actual or constructive knowledge of that right; and (3) Plaintiff intended to relinquish that right." Plaintiff argues that its proposed instruction is more complete on the doctrine of waiver and, thus, the trial court's instruction was improper.

¶ 74    We disagree. As the trial court's instruction states, waiver is the intentional relinquishment of a known right that can be demonstrated either by express words or implied by conduct. *UIDC Management, Inc. v. Sears, Roebuck & Co.*, 167 Ill. App. 3d 81, 84 (1988); *Whalen v.*

*K Mart Corp.*, 166 Ill. App. 3d 339, 343 (1988). The only significant difference between plaintiff's proposed instruction and the court's instruction is plaintiff's insertion of a definition for a "known right" as a right about which plaintiff "had actual or constructive knowledge." However, a "known right" is a self-defining and commonly understood phrase, as opposed to a technical term or words of art. See *Parikh v. Gilchrist*, 2017 IL App (1st) 160532, ¶ 34. In the absence of anything to obscure the meaning, a "known right" does not need to be defined. See *id.* We find that the court's instruction clearly conveyed the applicable law, and no abuse of discretion occurred in giving this instruction.

¶ 75     Plaintiff also challenges the trial court's instruction on agency that stated, "if you find that the defendant Steven Leech is not liable, then you must find that defendant Gozdecki, Del Giudice, Americus & Farkas, LLP is not liable." Plaintiff contends that the instruction improperly discounted its theory that the defendant law firm failed to adequately supervise Leech. Plaintiff, however, did not object when the trial court ruled on this instruction. "It is well established that the failure to object at trial to an asserted error in jury instructions waives the question." *Tannenbaum*, 82 Ill. 2d at 180.

¶ 76     Furthermore, plaintiff makes only a bare argument that the evidence showed the amount of time Leech spent on drafting the league agreement, and "Clifford Harstad's advice to Defendant Leech and the amount of time [they] spent on drafting the league agreement." Without further analysis or citations to authority, plaintiff concludes that "[t]his was more than enough evidence for the jury to find that the Defendant Law Firm was liable for legal malpractice for failing to adequately supervise Defendant Leech." We find plaintiff's argument insufficient to meet the requirements of Rule 341(h)(7), and therefore plaintiff has forfeited this issue on appeal. See *Wells Fargo Bank, N.A. v. Sanders*, 2015 IL App (1st) 141272, ¶ 43 (finding that the defendant's conclusory arguments, with no citations to relevant authority, violate Rule 341(h)(7) and do not merit consideration on appeal).

¶ 77     Plaintiff's final contention is that the trial court erred in submitting two special interrogatories to the jury. The trial court submitted a total of three special interrogatories and each one stated that the jury should consider it "if you find in favor of the plaintiff." The jury, however, found in favor of defendants. Even if submission of the interrogatories was error, reversal is not required absent a showing of prejudice to plaintiff. *Eaves v. Hyster Co.*, 244 Ill. App. 3d 260, 266 (1993). There is no indication in the record that the interrogatories improperly influenced the jury's determination or that the jury even considered the interrogatories.

¶ 78     Plaintiff is not entitled to a perfect trial but to a fair trial free of substantial prejudice. *Garest v. Booth*, 2014 IL App (1st) 121845, ¶ 48. We find that plaintiff's allegations either did not constitute error or, if error occurred, did not substantially prejudice plaintiff. Therefore, a new trial is not warranted here.

¶ 79     For the foregoing reasons, the judgment of the circuit court is affirmed.

¶ 80     Affirmed.