2020 IL App (1st) 190440-U

No. 1-19-0440

Order filed May 20, 2020

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 17 CR 7342 |
| | ) | |
| NASER SUHEIL, | ) | Honorable |
| | ) | Carol M. Howard, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE McBRIDE delivered the judgment of the court.
Presiding Justice Ellis and Justice Howse concurred in the judgment.

**ORDER**

¶ 1   *Held*: We affirm defendant's convictions for filing a fraudulent return in violation of the Tobacco Products Tax Act, forgery, and wire fraud over his contentions that (1) the State failed to prove him guilty beyond a reasonable doubt; and (2) he was denied his right to a fair trial based on certain evidentiary rulings made by the trial court.

¶ 2   Following a bench trial, defendant Naser Suheil was found guilty of filing a fraudulent

return in violation of the Tobacco Products Tax Act of 1995 (Tobacco Tax Act) (35 ILCS 143/10-

30, 10-50 (West 2014)), forgery (720 ILCS 5/17-3(a)(2) (West 2014)), and wire fraud (720 ILCS

5/17-24(b) (West 2014)), and sentenced to three concurrent two-year terms of probation. Defendant appeals, arguing (1) the State failed to prove him guilty beyond a reasonable doubt where it relied on the testimony of a witness who was not worthy of belief; (2) the trial court erred by precluding him from impeaching the credibility of the witness with the witness's prior conviction; (3) the court erred in making evidentiary rulings which precluded him from fully establishing the witness's lack of credibility; and (4) the court erred by denying his amended motion for a new trial based on newly discovered evidence. We affirm.

¶ 3    Defendant was the owner and sole officer of E&N United Corp. (E&N), which was a tobacco distribution business located in Bridgeview, Illinois. Following an investigation by the Illinois Department of Revenue (Department), the State charged defendant by indictment with, *inter alia*, filing a fraudulent tax return in violation of the Tobacco Tax Act, forgery, and wire fraud.

¶ 4    The State's theory of the case was that, in June 2014, defendant engaged in a scheme to avoid tax liability under the Tobacco Tax Act (35 ILCS 143/10-1 *et seq.* (West 2014)) by invoicing tobacco sales to an Indiana corporation, Istanbul Enterprises (Istanbul), that did not actually occur. In furtherance of this scheme, defendant filed a tax return on behalf of E&N for the month of June 2014 which reflected sales it made to Istanbul that did not actually occur. In addition, for the purpose of giving the June 2014 return an appearance of legitimacy, defendant forged a June 2014 invoice to Istanbul and delivered it to the Department, and gave $70,000 in cash to Istanbul's owner, Iman Ugurlu, with instructions to deposit into Istanbul's bank account and wire it to E&N's bank account. In support of its theory of the case, the State presented, *inter alia*, the testimony of

Ugurlu and Special Agent Jason Key, an investigator for the Department's criminal investigations division.

¶ 5    Prior to trial, the State filed a motion *in limine* which sought an order barring defendant from mentioning Ugurlu's May 2017 conviction for "Aiding and Abetting Sales Tax— Cigarettes—Unstamped, Untaxed" in Washington County, Minnesota, at any time during trial. The State's motion asserted that, in December 2017, the Minnesota court entered an order discharging his sentence of probation for that offense, which found Ugurlu had met the terms of his probation and paid court-ordered restitution in full. The State also asserted the Minnesota court's December 2017 order stated, "[t]his offense [was] deemed to be a [m]isdemeanor pursuant to MS Section 609.13." Thus, the State contended that, pursuant to Illinois Rule of Evidence 609 (Ill. R. Evid. 609 (eff. Jan. 1, 2011)), the Minnesota court found Ugurlu to have been rehabilitated such that his conviction could not be used to impeach his credibility. A copy of the Minnesota court's December 2017 order was purportedly attached to the State's motion but is not included in the record on appeal. However, the record reflects the order was tendered to the trial court with a copy of the motion.

¶ 6    During argument on the motion, defendant asserted the offense to which Ugurlu pled guilty was a felony, and it had occurred only one and a half years prior to trial. Defendant argued the Minnesota court's order merely terminated Ugurlu's probation and restored his rights similar to that which would have occurred had he completed a prison sentence. Thus, defendant argued the conviction was admissible to impeach Ugurlu's credibility.

¶ 7     The trial court granted the State's motion, finding "[t]his was not a crime of moral turpitude [or] deception" based on its "reading of the language of the crime." The matter proceeded to a bench trial, at which the following evidence was presented.

¶ 8     Ugurlu testified that, between 2011 and 2013, he managed a liquor store and purchased tobacco products from E&N. In 2013, he left his job at the liquor store and began working for E&N. Ugurlu did not have a specific job description at E&N and explained, "[t]here was no job duty. It was whatever. Make an order, chill, whatever." A typical day for Ugurlu included making orders and picking up and delivering tobacco products. He never handled cash for E&N, prepared invoices, or delivered invoices. Ugurlu's weekly pay was supposed to be $1000, but he instead received random cash payments in varying amounts from defendant and his "associates," Aziz Cadus, Nabil Qadoos, and Naser Farhan.[1] Taxes were not withheld from his pay and he did not receive a W-2 wage and tax statement at the end of the year.

¶ 9     About a month after he began working at E&N, Ugurlu met with defendant and Aziz at E&N's warehouse. Defendant and Aziz directed Ugurlu to obtain an other tobacco products (OTP) license in Indiana, and Ugurlu agreed to do so. Defendant and Aziz referred Ugurlu to an accountant, Abdo Halawa, to apply for the license. Ugurlu went to Halawa's office with Hazem Judeh, whom Ugurlu believed to be defendant's cousin, and gave a woman there his identification and social security cards. At that time, he also formed Istanbul. He did not pay anything to Halawa for the services and he later received the OTP license through the mail.

---

[1] Because defendant presented the testimony of Aziz Cadus and his brother, Mohamad Cadus, we will refer to Aziz and Mohamad by their first names.

¶ 10    Around that time, Ugurlu and Judeh went to St. John, Indiana, and leased a warehouse from James Buchanan so Istanbul could have a physical location in case the Indiana Department of Revenue did an inspection. Istanbul leased the space on a month-to-month basis, and the last month of the lease was January 2014.

¶ 11    In June 2014, Ugurlu met with defendant at the Nile Restaurant in Bridgeview. At the meeting, defendant gave Ugurlu $70,000 in $20 bills in a black plastic bag and directed Ugurlu to deposit the money into Istanbul's account and wire it back to him the next morning. Ugurlu identified a statement from Istanbul's TCF bank account dated June 30, 2014, which was admitted into evidence. The statement showed, on June 11, 2014, Ugurlu made a $70,000 deposit into the account and, on June 12, 2014, he wired $70,000 from Istanbul's account to E&N's account.

¶ 12    In the fall of 2014, Ugurlu received notice that he was being audited by the Indiana Department of Revenue. Ugurlu confronted defendant about the audit, and defendant told him not to worry. After Ugurlu received notice of the audit, defendant took Ugurlu to his accountant, Ally Daoud, at Matrix Accounting (Matrix). With Ugurlu present, defendant and Daoud spoke for about 10 minutes in Arabic, a language Ugurlu did not understand.

¶ 13    Ugurlu terminated his relationship with E&N when, in the fall of 2014, he discovered invoices that were billed to Istanbul in a file cabinet inside E&N's office.[2] One of these invoices, dated June 25, 2014, indicated that E&N sold Istanbul $105,141 in tobacco products. Ugurlu testified Istanbul never purchased the products purported to have been sold as reflected in the invoice.

_____

[2] Ugurlu originally testified he found the invoices in October or November 2013 but later clarified it was in the fall of 2014.

¶ 14    Ugurlu also identified a bill of lading dated June 25, 2014, which was admitted into evidence. The bill of lading referenced the June 25, 2014, invoice and indicated Far Transportation was to deliver 363 boxes of tobacco products to Istanbul in St. John, Indiana, on behalf of E&N. Ugurlu explained that Far Transportation was a shipping company owned by Farhan. In June 2014, Far Transportation's fleet consisted of a single 16-foot by 9-foot Chevrolet box truck. According to Ugurlu, it was not possible for 363 boxes of tobacco to fit on Far Transportation's truck. Ugurlu explained each box of tobacco would have been about "30 inches long, 20 inches deep[,] and 20 inches high," only 20 boxes could fit on a pallet, and only six pallets could fit on Far Transportation's truck. Rather, a 40-foot trailer would be required to ship that much product.

¶ 15    Ugurlu never authorized the tobacco products listed on the June 25, 2014, invoice to be shipped to Istanbul, and he was never in St. John, Indiana to receive them. He also never authorized another person to receive those products, and Istanbul did not have the warehouse space at the time the products were purportedly shipped. Ugurlu signed the bill of lading in the fall of 2014, and did so at the direction of Farhan, who told him they needed to "cover [their] butts" in relation to the Indiana audit.

¶ 16    On cross-examination, Ugurlu testified he met with Special Agent Jason Key on several occasions. Ugurlu did not recall telling Key that he was offered $1500 per month, not $1000 per week, to deliver tobacco products. When asked whether he complained to Aziz about not being paid by E&N as agreed, Ugurlu answered he "complained to everybody, even to the workers." The following colloquy then occurred:

"Q. Well, on Page 12 [of the grand jury transcript] were you asked this question – and I'm going to go to – the question was: Can you explain to the grand jury how –what

you were compensated? Answer: In the beginning, I was getting paid different amounts. It could be 700, 1,000, 500. And me being a new employee, I didn't want to keep asking them, you know, why am I not getting paid? I gave it a month or two. It continued on. I was not getting my full payment.

After a couple months, I asked Aziz like, hey, what's going on with my paycheck? I'm getting 700, 1,000 bucks. I'm supposed to get $1,500 bucks [*sic*]. He said, don't worry. You know your money is good with us. He said, I have a lot of money. He was like I would never steal or, you know, not pay you whatever we promised to pay you.

Were you asked that question and did you give that answer?

A. Yes.

\*\*\*

Q. Did you also say: He's like there's a lot of stuff going on. We need all the money for the product and whatnot[.] He said but don't worry, I'm going on a little vacation. Once I get back from my vacation, you know, he's like we'll square everything away, which I said okay. You know, it seems cool. It's like you're saving my money for me but that wasn't the case.

That's the rest of the answer that you gave –

A. Yes."

¶ 17    Defense counsel asked Ugurlu whether, when he met with Halawa about the Indiana audit, Halawa told him he needed $5000 to fix the audit issues, and the State raised a hearsay objection. Defense counsel made the following offer of proof:

"[I]f Jason Key were allowed to testify, he would testify that Mr. Ugurlu stated that he went to see the accountant and was told that he needed $5,000 to fix the audit issues. Ugurlu stated he was told everything was going to be taken care of. And that is from Jason Key's records."

The trial court sustained the objection and told defense counsel he could rephrase the question to avoid eliciting a hearsay response. Defense counsel then asked Ugurlu whether he left the accountant's office with the impression a $5000 payment would fix the audit and that "everything was going to be taken care of," and Ugurlu responded in the negative.

¶ 18    Ugurlu did not recall telling Key that he met with Halawa three or four times and that he felt the accountant did not do anything for him. He did not pay any money to Halawa because Halawa "never did anything for [him]." Defendant, not Ugurlu, was supposed to pay Halawa for incorporating Istanbul. Ugurlu testified defendant did not tell Ugurlu he knew Halawa well but defendant did know who Halawa was, where he was located, and that he was "the guy to get the license."

¶ 19    Ugurlu testified the State never brought charges against him as a result of his participation in the tax fraud at issue in this case. He did not recall telling Key that he felt like he had been "screwed over" by defendant, Aziz, and Farhan, or that testifying against defendant was like "payback" for what they had done to him.

¶ 20    Ugurlu denied that a driver from Far Transportation ever met him in Indiana, backed the Far Transportation truck to his truck, and transferred products from the Far Transportation truck to his truck. Ugurlu did not have a truck; rather Judeh bought a truck for $13,000 and permitted

Ugurlu to use it when Ugurlu needed it. Ugurlu admitted he told the grand jury he was given $13,000 to buy a truck and he bought a truck from a commercial car lot.

¶ 21    Buchanan testified that he was the proprietor of Standard Lumber Company (Standard), a corporation that owned and leased a warehouse building in St. John, Indiana, that contained a combination of retail, office, and warehouse space. In October 2013, Istanbul rented office warehouse space from Standard pursuant to a month-to-month lease and Ugurlu signed the lease on behalf of Istanbul. Standard received rent payments from Istanbul in October and November 2013. When a rent check bounced in January 2014, Buchanan went to the location and saw "they had moved out." As a result, he stopped invoicing Istanbul in January and rented the space to a different entity. Buchanan did not believe Istanbul was at the location at anytime between February and December 2014.

¶ 22    Special Agent Jason Key testified he was an investigator in the Department's criminal investigations division, and he explained how taxes pursuant to the Tobacco Tax Act are reported, paid, and collected. Key explained that tobacco distributors are required to file monthly returns under the Tobacco Tax Act and do so using a form known as the TP-1 form. Key explained the steps distributors must follow to complete the TP-1 form. Returns are filed on the 15th day of the month and report sales made in the previous month. Tobacco distributors must report their out-of-state tobacco sales on the TP-1 form and must attach a schedule, known as the TP-11 schedule, to the return. The TP-11 schedule reports each out-of-state sale and must include certain information about the sale, including the name, address, and taxpayer identification number of the business to which the sale was made, the date of the sale, and the amount of the sale. Key explained a distributor's out-of-state sales operate as a deduction which lower the distributor's tax liability.

¶ 23    Key was assigned to investigate E&N. He identified various documents relating to E&N's incorporation, registration, licensure, and income taxation, which were later admitted into evidence. According to Key, those documents indicated defendant was the sole officer and shareholder of E&N.

¶ 24    As part of his investigation, Key requested and received records relating to E&N's account at Standard Bank and Istanbul's account at TCF Bank. E&N's June 2014 bank statement showed that, on June 12, 2014, E&N received a wire transfer in the amount of $70,000 from Istanbul's account at TCF Bank. Istanbul's June 2014 statement showed that, on June 11, 2014, Istanbul made a $70,000 deposit into its account and, on June 12, 2014, wired that same amount to E&N's account.

¶ 25    During his investigation, Key made a formal demand to E&N for the production of its books and records, which included invoices and bills of lading for tobacco products sold to Istanbul. Pursuant to Key's demand, defendant produced a bill of lading and an invoice, both of which were dated June 25, 2014. Key explained the June 25, 2014, invoice indicated E&N made a sale in the amount of $105,411 to Istanbul, which matched one of the sales E&N listed on the TP-11 schedule attached to its June 2014 TP-1 return.

¶ 26    Daoud testified she was the owner of Matrix and was an enrolled preparer with the Internal Revenue Service. In 2011, defendant hired Matrix to perform accounting services for E&N, including the preparation of its TP-1 returns and quarterly payroll tax returns. Defendant authorized Matrix to sign E&N's TP-1 returns on its behalf. Daoud prepared E&N's TP-1 returns and submitted them electronically to the Department. Each month, E&N sent her a QuickBooks sheet detailing its purchases and sales and a mock TP-1 return that she would then check for

mathematical accuracy and submit electronically. Daoud identified the documents she received from E&N in relation to her preparation of the June 2014 TP-1 return, which included a mock TP-1 return and a mock TP-11 schedule. These documents were admitted into evidence. The mock return for June 2014 that was sent to Matrix by defendant and the actual return submitted by Matrix on behalf of E&N were admitted into evidence. According to Daoud, Matrix prepared the June 2014 TP-1 return that was actually filed using the mock return and schedules defendant provided her.

¶ 27    Daoud searched the records Matrix had retained relating to E&N's business, including those relating to Matrix's preparation of E&N's quarterly payroll tax returns, and did not find any record showing Ugurlu was an employee of E&N. If an employee was paid cash "under the table," no tax forms would be prepared or filed with respect to that employee. Daoud had no reason to suspect E&N was paying any employee cash and not on its regular payroll.

¶ 28    The State rested and defendant moved for a directed finding. The trial court denied the motion.

¶ 29    Halawa testified that, in August or September 2013, he met with Judeh and Ugurlu regarding the formation of Istanbul and the procurement of an Indiana tobacco wholesaler license for the corporation. Defendant's name was not mentioned during the meeting, and Halawa was never made aware Judeh and Ugurlu were forming Istanbul at defendant's behest. Halawa was successful in obtaining the Indiana license for Istanbul. He was not paid for his services. Prior to the meeting to form Istanbul, Judeh and Ugurlu had contacted Halawa in relation to obtaining a tobacco license in Pennsylvania.

¶ 30    Khaled Damouni testified that, from 2013 to 2016, he worked as a driver for Far Transportation. Damouni was the primary driver but Farhan would occasionally make deliveries. Damouni made two or three separate deliveries to Ugurlu in Indiana, each of which occurred on different days. On the first such occasion, the delivery was not made to a warehouse. Rather, Ugurlu gave Damouni an address and directed him to park in a parking lot. Ugurlu arrived with his own truck, parked it "back-to-back" with Damouni's truck, and transferred the goods to Ugurlu's truck. Damouni could not recall the address to which he made this delivery, which business the parking lot served, or what city it was in. He stated it was not far from Interstate 65 but he could not recall the exit he took to get to the parking lot. On the second occasion, Damouni met Ugurlu at the same address but they then moved to a location about 5 to 10 minutes away, at which time they again made a truck-to-truck transfer of goods.

¶ 31    Damouni did not recall the exact dates on which he made deliveries to Ugurlu but believed the deliveries took place during the summer of 2014. Damouni knew he had delivered cigars but could not remember the exact products he delivered. He made the deliveries in a Chevrolet box truck that was 16 feet long, 9 feet tall, and 9 feet wide, and could hold 8 pallets of goods. The truck was the only truck Far Transportation used in 2014. Damouni did not load the truck for the deliveries he made to Ugurlu. Damouni did not help Ugurlu load his truck during the transfers. Damouni checked invoices he had for the shipments to confirm what goods were to be delivered to Ugurlu but he did not compare the products listed on the invoice to what Ugurlu transferred to his truck.

¶ 32    Aziz Cadus testified he worked for E&N in 2013 and 2014. While Aziz worked at E&N, Ugurlu was a customer, not an employee. Aziz did not send Ugurlu to meet with Halawa in regard

to procuring an OTP license, and he never gave cash to Ugurlu to buy a truck or for any other reason. Aziz testified he had known defendant for a long time and they emigrated from the same town in Palestine.

¶ 33    Nabil Qadoos testified that, from 2013 to 2015, he worked at E&N as a salesman. Ugurlu was a customer, not an employee, of E&N. Ugurlu would make small and large orders for Istanbul from E&N. Defendant prepared the invoices and shipping documents for the orders made by Istanbul. Qadoos was a close friend of defendant and had known him for 16 years.

¶ 34    Mohamad Cadus testified he and defendant were friends. From June or July 2014 until the end of 2015, Mohamad worked at E&N, stocking, boxing, and shelving products. According to Mohamad, Ugurlu was a customer, not an employee, of E&N.

¶ 35    Defendant's cousin, Mohammed Abid, testified that, from the summer of 2013 to 2016, he worked for Farhan at South Side Wholesale. South Side Wholesale was in the same location as E&N. According to Abid, Ugurlu was not employed by E&N. Rather, he would come in and talk to and make orders with defendant.

¶ 36    Mohammed Srour testified that, between November 2013 and March 2016, he worked as a cashier at E&N. Ugurlu was a customer, not an employee, of E&N.

¶ 37    Key testified that, as part of his investigation of defendant and E&N, he interviewed Ugurlu before Ugurlu testified before the grand jury. At that time, Ugurlu told Key he was an employee of E&N and was being paid in cash. Ugurlu told Key about his meeting with Halawa, but Key did not speak with Halawa prior to his or Ugurlu's grand jury testimony. Nor did Key ask Daoud to confirm Ugurlu's employment with E&N.

¶ 38     Key also testified before the grand jury. Key did not tell the grand jury he had not verified Ugurlu's employment with E&N with either Halawa or Daoud.

¶ 39     Defense counsel asked Key whether the only person Key interviewed prior to either his or Ugurlu's grand jury testimony was Ugurlu, and the State objected, stating "[t]his is a direct examination supposedly to impeach Mr. Ugurlu, and it's turning into a second attempt at cross-examination." Defense counsel responded that he was not looking to impeach Ugurlu's testimony but rather demonstrate the State's lack of investigation into Ugurlu's credibility. The court sustained the objection, finding the correct way for defense counsel to accomplish his stated goal was to ask Key what he did during his investigation and not ask him what he testified to before the grand jury.

¶ 40     Key reviewed the transcript of Ugurlu's grand jury testimony prior to trial and learned Ugurlu testified that he worked for E&N. Key could not recall whether Ugurlu testified he was being paid in cash and checks or just cash. Defense counsel, in an attempt to refresh Key's recollection, tendered a transcript of Ugurlu's grand jury testimony to Key. The State objected, stating defense counsel had not laid a proper foundation to refresh Key's recollection or any other reason for showing him the transcript, and the trial court sustained the objection. Defense counsel continued to question Key regarding Ugurlu's grand jury testimony, and the State objected, stating "[e]ven if he read the transcript, he can't testify to the transcript." Defense counsel made the following offer of proof: "the grand jury testimony of April 14th, 2016, on Page 12, line 11 and 12, the testimony from Mr. Ugurlu says, after a couple of months, I asked Haziz [*sic*] like, hey, what's going on with my paycheck. I'm getting 700, [1000] bucks. I'm supposed to get [1500] bucks." The court sustained the State's objection.

¶ 41    Key testified that, on March 5, 2015, he was contacted by federal law enforcement officials in relation to a shipment of products that originated from Basik Trading, Inc. (Basik), in Palm Beach, Florida, that was supposed to be delivered to a freight terminal in Sauk Village, Illinois. The shipment was supposed to go "to Istanbul Enterprise in St. John, Indiana," but the receiver of the shipment scheduled a truck-to-truck transfer to be made in the parking lot of the Cabela's store in Hammond, Indiana. Key did not witness the transfer but learned the product shipped by Basik "was picked up by an individual previously identified as being associated with another Indiana distributorship called Four Seasons Wholesale which [was] believed to be linked to another business in Chicago." Shiraz Khan, the owner of Four Seasons, was identified as the person who picked up the shipment. He also learned Ugurlu was not present for the transfer.

¶ 42    During the course of his investigation, Key never learned that Ugurlu had been accused of having products shipped to him at parking lots or other places of business in Indiana or that Ugurlu had done a truck-to-truck transfer of tobacco products. Key was aware Ugurlu was under investigation by the Indiana Department of Revenue. Key testified he and another special agent interviewed Ugurlu on May 19, 2016, in relation to an investigation of which Ugurlu was not the target. Rather, they believed Ugurlu had information relevant to their investigation. Key also spoke to Ugurlu about a Missouri tobacco license.

¶ 43    Key testified he and Ugurlu discussed "burner licenses," which Key explained are "tobacco license[s] that [are] set up in someone else's name [and are] utilized by other individuals and businesses to purchase untaxed tobacco." The license is set up in a different state to make it difficult for Illinois authorities to determine who is using the license and who is the party responsible for it. Entities use the "burner license" to purchase untaxed tobacco products in Illinois

for the purpose of avoiding the 36 percent tobacco tax. Ugurlu was not involved in setting up "burner licenses" but Key did ask him to obtain information on a "burner license" which was issued to Ugurlu's state-wide distributor. He also discussed with Ugurlu purchases that Ugurlu had made from Ran Wholesale under a "burner license." According to Key, Istanbul's license did not become a burner license. He acknowledged, however, that other people were using Istanbul's license to purchase tobacco.

¶ 44    The trial court found defendant guilty of filing a fraudulent return in violation of the Tobacco Tax Act, forgery, and wire fraud. In doing so, the court stated it had reviewed its notes, analyzed the exhibits introduced into evidence, and assessed the witnesses' credibility.

¶ 45    Defendant filed a posttrial motion, which was later amended.[3] In his amended motion, defendant argued (1) the State failed to prove him guilty beyond a reasonable doubt where its case depended on Ugurlu's testimony, which was unworthy of belief; (2) the trial court erred by barring him from using Ugurlu's 2017 conviction to impeach his credibility; and (3) the trial court did not allow him to fully question Ugurlu and Key regarding Ugurlu's extensive history of engaging in tobacco-tax evasion schemes.

¶ 46    In addition, defendant argued he had obtained newly discovered evidence which entitled him to a new trial. Defendant attached to his amended motion the affidavit of an attorney, Lawrence Schoenbach, who averred that he was the attorney for a Florida based tobacco wholesaler, Basik. According to Schoenbach, Basik's president, Andrew Katz, believed both Istanbul and a related company known as Four Seasons were owned and operated by Ugurlu. From 2014 to mid-2017, Basik sold tobacco products to both entities which "were consigned to Saint

_____

[3] The record does not contain defendant's original motion for new trial.

John, Indiana for delivery to Indiana." In the spring of 2018, the Indiana Department of Revenue levied a $5 million civil tax assessment against Basik for unpaid tobacco taxes in Indiana for the sales Basik had made to Istanbul and Four Seasons between 2014 and 2017. As a result of the assessment, in June 2018, Schoenbach spoke to the assistant attorney general (AAG) responsible for prosecuting the case against defendant because he "believed the tobacco that formed the subject within the indictment was, in fact, the tobacco sold by Basik to 'Sam' through either or both of Sam's two entities, Istanbul and/or Four Seasons."[4] Based on his conversation with the AAG, on July 3, 2018, Schoenbach contacted Key to discuss the case and learned at that time that Key was fully aware of Basik and had spoken with Katz. Schoenbach and Key discussed Ugurlu and the fact that "[i]n 2014, Istanbul/Four Seasons had a valid OTP license in Indiana but it lapsed sometime in late 2014" but "Istanbul/Four Seasons, nonetheless, continued to use its lapsed Indiana license to purchase [tobacco products] from Basik—concealing from Basik the fact that the license was no longer valid." Further, according to Schoenbach, Ugurlu held himself out as having a proper OTP license during the relevant timeframe.

¶ 47 Based on Schoenbach's affidavit, defendant asserted the State had become aware of Ugurlu's participation in another scheme to avoid tobacco taxes six days prior to trial and, that same day, Key and the AAG responsible for prosecuting defendant contacted Schoenbach to discuss Ugurlu. Defendant contended Schoenbach told the AAG and Key about Ugurlu, Ugurlu's purchase of tobacco products from Basik without a license and without paying taxes, the fact Ugurlu had held himself out as having a proper license when he did not, and the fact Ugurlu was the owner of Four Seasons contrary to Key's testimony that it was owned by Shiraz Khan.

_____

[4] It is not clear whether the "Sam" referred to in Schoenbach's affidavit is Ugurlu or some other person.

Defendant did not contend the State failed to inform him of the conversations between the AAG, Key, and Schoenbach; rather, the evidence came to his counsel's attention "only since the verdict in this case." He contended the evidence showed the State was conscious of Ugurlu's extensive participation in schemes to avoid tobacco taxes and that he was entitled to a new trial "to fully present evidence concerning the credibility of the State's central and indispensable witness, Iman Ugurlu."

¶ 48　At the hearing on defendant's amended motion for new trial, the State asserted, in regard to defendant's newly discovered evidence, it had tendered information relating to its discussions with Schoenbach to defense counsel prior to trial by email. Thus, the State asserted the information contained in Schoenbach's affidavit was not newly discovered evidence.

¶ 49　The trial court denied defendant's amended motion for new trial and sentenced him to three concurrent two-year terms of probation. This appeal followed.

¶ 50　Defendant first argues that this court should reverse his convictions because the State failed to prove his guilt beyond a reasonable doubt where it relied solely on the testimony of Ugurlu, who was unworthy of belief. We disagree.

¶ 51　When a defendant presents a challenge to the sufficiency of the State's evidence, "a reviewing court must determine whether after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Internal quotation marks omitted; emphasis in original.) *People v. Ross*, 229 Ill. 2d 255, 272 (2008). In doing so, the reviewing court does not retry the defendant, and "the trier of fact remains responsible for making determinations regarding the credibility of witnesses, the weight to be given their testimony, and the reasonable inferences to be drawn from

the evidence." *Id.* The mere fact that the trier of fact accepted certain testimony or made certain inferences based on the evidence does not guarantee reasonableness of the decision. *Id.* However, a reviewing court will not reverse a conviction simply because the evidence is contradictory or because the defendant claims a witness is not worthy of belief. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009). "A criminal conviction will not be set aside unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt." *People v. Collins*, 106 Ill. 2d 237, 261 (1985).

¶ 52    To sustain defendant's conviction for filing a fraudulent return in violation of section 10-50 of the Tobacco Tax Act, the State was required to prove beyond a reasonable doubt that defendant was an officer of a corporation engaged in the business of distributing tobacco products, "file[d] or cause[d] to be filed or sign[ed] or cause[d] to be signed a fraudulent return filed on behalf of the corporation," and the amount of tax due was $300 or more. 35 ILCS 143/10-50 (West 2014).

¶ 53    After reviewing the evidence in the light most favorable to the State, we find a rational trier of fact could conclude defendant caused to be filed a fraudulent tax return in violation of section 10-50 of the Tobacco Tax Act. The record establishes that defendant was the sole officer of E&N. Defendant engaged Matrix Accounting to prepare and file the returns required under the Tobacco Tax Act and authorized Matrix to sign the returns on his behalf. In furtherance of his duty to file the returns, defendant provided a mock TP-1 return to Matrix, which Matrix then used to generate, sign, and submit the final tax return. Relevant here, in July 2014, defendant provided a mock return to Matrix's employee, Daoud, which indicated, in June 2014, E&N sold $276,901 of tobacco products to out-of-state entities. In addition to the mock return, defendant also provided a mock

TP-11 form, which indicated that, on June 25, 2014, E&N sold $105,411 in tobacco products to Istanbul in St. John, Indiana. Based on the mock return submitted by defendant, Daoud filed a return containing this sale on behalf of E&N. However, the evidence established this sale never took place. Ugurlu, the owner of Istanbul, testified he never made the purported purchase on June 25, 2014. Additionally, E&N's June 2014 TP-1 return established the tax due for June 2014 exceeded $300. This evidence and the reasonable inferences drawn therefrom were sufficient to sustain defendant's conviction for filing a fraudulent return.

¶ 54    To sustain defendant's conviction for forgery, the State was required to prove beyond a reasonable doubt that he, with the intent to defraud, knowingly issued or delivered a false document knowing it to have been falsely made. 720 ILCS 5/17-3(a)(2) (West 2014).

¶ 55    After viewing the evidence in the light most favorable to the State, we find a rational trier of fact could reasonably conclude defendant committed the offense of forgery. The evidence at trial established defendant was the only person who prepared invoices to E&N's customers. Defendant prepared an invoice, dated June 25, 2014, which reflected a sale of $105,411 of tobacco products from E&N to Istanbul. Defendant delivered the June 25, 2014, invoice to Key in response to Key's demand for documents. The record establishes the June 25, 2014, sale from E&N to Istanbul did not take place, as Ugurlu testified Istanbul did not make the purchase reflected in the invoice. In addition, the record shows the June 25, 2014, sale was used to support E&N's June 2014 TP-1 return and accompanying TP-11 schedule. This evidence was sufficient to sustain defendant's conviction for forgery.

¶ 56    To sustain defendant's conviction for wire fraud, the State was required to prove beyond a reasonable doubt that he (1) devised a scheme or artifice to defraud, and (2) for the purpose of

executing the scheme or artifice, transmitted or caused to be transmitted "any writings, signals, pictures, sounds, or electronic or electric impulses by means of wire, radio, or television communications *** so that the transmission [was] received by a person within this State." 720 ILCS 5/17-24(b) (West 2014).

¶ 57    Here, the evidence established that, in June 2014, defendant and Ugurlu met at the Nile Restaurant in Bridgeview and defendant tendered a black plastic bag containing $70,000 in $20 bills to Ugurlu. Defendant instructed Ugurlu to deposit the money into Istanbul's account and wire it to E&N's account the next day. Ugurlu testified he followed defendant's instructions. On June 11, 2014, Ugurlu deposited the $70,000 in cash into Istanbul's account and, on June 12, 2014, he wired that same amount to E&N. Ugurlu's testimony was corroborated by E&N's and Istanbul's June 2014 bank statements, which were admitted into evidence, and confirmed that, on June 11 and June 12, 2014, those transactions took place. Additionally, the evidence showed, in June 2014, defendant claimed his business, E&N, had made out-of-state tobacco sales, which acted as a credit to E&N's liability under the Tobacco Tax Act, but those sales were not actually made. Viewing this evidence in the light most favorable to the State, the trial court could reasonably conclude defendant committed the offense of wire fraud.

¶ 58    Defendant nevertheless contends that, absent Ugurlu's testimony, the documentary evidence presented by the State was capable of innocent construction. He argues that, by his own admission, Ugurlu was an unindicted coconspirator, other evidence showed he was involved in prior schemes to avoid tobacco taxes, and Ugurlu's testimony was otherwise uncorroborated. Thus, defendant argues, Ugurlu's testimony was not worthy of belief. He maintains that, because the

State's case turned on whether Istanbul actually made the purchase reflected in the June 25, 2014, invoice, and because Ugurlu was unworthy of belief, this court should reverse his convictions.

¶ 59    Courts have long recognized that the testimony of an unindicted coconspirators and accomplices is to be viewed with caution and suspicion. See *e.g.*, *People v. Tenney*, 205 Ill. 2d 411, 429 (2002). However, "the testimony of an accomplice witness, whether corroborated or uncorroborated, is sufficient to sustain a criminal conviction if it convinces the [trier of fact] of the defendant's guilt beyond a reasonable doubt." *Id.* Indeed, a witness's status as an accomplice bears only on the weight of the evidence. *People v. Beals*, 165 Ill. App. 3d 955, 960 (1988). As noted above, it is the unique function of the trier of fact to weigh the evidence and the relative credibility of the witnesses, and this court will not substitute its judgment for that of the trier of fact.

¶ 60    Here, defense counsel extensively cross-examined Ugurlu with respect to his involvement in the crime at issue, the fact he was under investigation by the Indiana Department of Revenue, and the inconsistencies and infirmities in his testimony. The trial court also heard evidence which cast doubt on Ugurlu's employment with E&N, his fluctuating statements regarding the pay he was to receive for that employment, and defendant's involvement in the scheme to have Ugurlu procure an OTP license. In finding defendant guilty of the three offenses at issue, the trial court expressly stated it considered the evidence in light of the relative credibility of the witnesses. It is not our prerogative to reweigh the evidence presented or reassess the credibility of the witnesses (*Ross*, 229 Ill. 2d at 272), and we will not reverse defendant's convictions merely because he asserts Ugurlu was not a credible witness (*Siguenza-Brito*, 235 Ill. 2d at 228).

¶ 61    Moreover, we reject defendant's argument that Ugurlu's testimony was uncorroborated. While no witness other than Ugurlu testified that defendant gave Ugurlu cash with instructions to

deposit it and wire it back to E&N or that E&N did not actually make the sale reflected in the June 25, 2014, invoice, the State presented corroborating evidence by other means. E&N's and Istanbul's June 2014 bank statements corroborated Ugurlu's testimony that defendant gave him $70,000 in cash with instructions to deposit it and wire it back to E&N's account. Defendant contends it is reasonable to conclude, however, that Ugurlu deposited his own funds into Istanbul's account on June 11, 2014, to cover expenses he expected to incur the next day. While this may be a reasonable inference to draw from the evidence, it is the trier of fact, not this court, which draws inferences from the evidence. *Tenney*, 205 Ill. 2d at 428. In doing so, the court is not required to disregard the inferences that flow from the evidence or search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt. *People v. Brown*, 2013 IL 114196, ¶ 71. We, as the reviewing court, are required to view the evidence in the light most favorable to the State and draw all reasonable inferences from that evidence in its favor. *People v. Bush*, 214 Ill. 2d 318, 326 (2005).

¶ 62    Additionally, Buchanan's and Damouni's testimony corroborated Ugurlu's testimony that the June 25, 2014, sale from E&N to Istanbul did not actually occur. Buchanan testified Istanbul's month-to-month lease was terminated in January 2014, long before the purported June 25, 2014, purchase, and he thereafter leased the space to someone else, thus rendering it impossible for the products to have been delivered to Istanbul's St. John, Indiana, location. While Damouni testified he made two or three deliveries to Ugurlu in Indiana, all of which were truck-to-truck transfers, his recollection of the details of those deliveries was vague. Moreover, Damouni's testimony regarding the dimensions of Far Transportation's only truck corroborated Ugurlu's account that it

would not have been possible for the 363 boxes which purportedly contained the entirety of the June 25, 2014, purchase to have been delivered to Ugurlu in one trip.

¶ 63    Defendant nevertheless argues Damouni testified that Farhan also made deliveries for Far Transportation and the evidence did not preclude a finding that the delivery was made in several trips. Again, it is well-settled "the trier of fact is not required to accept any possible explanation compatible with the defendant's innocence and elevate it to the status of reasonable doubt" (*Siguenza-Brito*, 235 Ill. 2d at 220), and we will not do so on review. Accordingly, we conclude the State presented sufficient evidence to sustain the trial court's findings of guilt. As mentioned, a criminal conviction will not be set aside unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *Collins*, 106 Ill. 2d at 261. This is not one of those cases.

¶ 64    Defendant next argues he is entitled to a new trial because the trial court improperly precluded him from using Ugurlu's 2017 Minnesota conviction to impeach his credibility. According to defendant, the Minnesota court's December 2017 order clearly showed Ugurlu's conviction was a felony and, because the conviction occurred within 10 years of his testimony, it should have been admitted under Illinois Rule of Evidence 609 (eff. Jan. 6, 2015) for the purpose of impeachment. Additionally, defendant argues the State failed to establish the Minnesota court's order brought Ugurlu's conviction within the scope of Rule 609(c).

¶ 65    Rule 609(a) provides that evidence that a witness has been convicted of a crime is admissible to attack the credibility of a witness if the crime was punishable by imprisonment in excess of one year or involved dishonesty or false statement regardless of the punishment. Ill. R. Evid. 609(a) (eff. Jan. 6, 2015). Evidence of the conviction is not admissible, however, if more

than 10 years has elapsed since the date of conviction or release from confinement, whichever is later. Ill. R. Evid. 609(b) (eff. Jan. 6, 2015). Additionally, "[e]vidence of a conviction is not admissible under this rule if (1) the conviction has been the subject of a pardon, annulment, certificate of rehabilitation, or other equivalent procedure, and (2) the procedure under which the same was granted or issued required a substantial showing of rehabilitation or was based on innocence." Ill. R. Evid. 609(c) (eff. Jan. 6, 2015).

¶ 66    As an initial matter, we note our review of this issue has been hindered by the fact the Minnesota court's December 2017 order is not included in the record on appeal. The record indicates the order at issue was attached as an exhibit to the State's motion *in limine* and was considered by the trial court. Defendant did not seek to supplement the record and instead appended the order to his brief, in violation of Supreme Court Rule 342. See Ill. S. Ct. R. 342 (eff. Oct. 1, 2019) (setting forth what should be contained in the appendix to the appellant's brief); *Foutch v. O'Bryant*, 99 Ill. 2d 389, 392 (1984) (the appellant has the burden to present a sufficiently complete record of the proceedings to support a claim of error). This problem has been compounded by the fact that neither party recognized the order's omission from the record and both cited to it extensively in their arguments on the issue. Because the Minnesota court's order is not contained in the record, we are unable to consider it. See *Keener v. City of Herrin*, 235 Ill. 2d 338, 346 (2009).

¶ 67    We also note the parties dispute the applicable standard of review. According to defendant, the trial court misinterpreted the Minnesota court's order and how Rule 609 applied to it. Defendant contends this was an error of law which frustrated the court's exercise of discretion and, therefore, we should apply a *de novo* standard of review to the issue. See *People v. Williams*, 188

Ill. 2d 365, 369 (1999). The State argues this court should apply the well-established standard of review applicable to evidentiary rulings, *i.e.* whether the trial court abused its discretion. See *People v. Caffey*, 205 Ill. 2d 52, 89 (2001).

¶ 68 We need not resolve the parties' dispute over the standard of review. Nor need we resolve whether the trial court erred by granting the State's motion *in limine* and barring evidence of Ugurlu's prior conviction because, even if we assume the trial court erred, the error was harmless. See *People v. Tate*, 87 Ill. 2d 134, 147-48 (1981) (finding the trial court erred by precluding the defendant from impeaching a witness with his robbery prior conviction and applying harmless-error analysis).

¶ 69 Evidentiary errors require reversal only where the record establishes the error resulted in prejudice affecting the outcome of the trial. *People v. Ramos*, 2018 IL App (1st) 151888, ¶ 24. In other words, harmless errors do not warrant reversal of the trial court's judgment. *Id.* An evidentiary error is harmless where there is no reasonable probability that the trier of fact would have acquitted the defendant absent the error. *People v. Stull*, 2014 IL App (4th) 120704, ¶ 104.

¶ 70 Here, we are not persuaded that there is a reasonable probability that the trial court would have acquitted defendant had it permitted him to impeach Ugurlu's credibility with his prior conviction for "Aiding and Abetting Sales Tax – Cigarettes – Unstamped, Untaxed." We agree with defendant that Ugurlu's testimony was integral to the State's case. Ugurlu testified Istanbul did not purchase tobacco products from E&N as indicated on the June 25, 2014, invoice, which helped establish defendant had filed a fraudulent tax return and forged the June 25, 2014, invoice to make the tax return appear legitimate. Ugurlu's also testified that defendant gave him $70,000 in cash and instructed him to deposit it into Istanbul's account and wire it to E&N. Without

Ugurlu's testimony, the State would not have been able to prove defendant committed the offenses at issue.

¶ 71    However, the State presented additional evidence which strongly corroborated Ugurlu's testimony. The testimony of Buchanan and Damouni corroborated Ugurlu's testimony that Istanbul did not purchase tobacco products from E&N in June 2014. Buchanan testified that, at that time, Istanbul vacated the warehouse space it had previously rented from Standard, thus making it impossible for the products to have been shipped to the physical location as indicated on the bill of lading relating to the June 25, 2014, invoice. While Damouni testified he made two or three truck-to-truck transfers with Ugurlu, his testimony corroborated Ugurlu's regarding the dimensions of the truck purportedly used by Far Transportation to deliver the products to Ugurlu, and the fact it would have been impossible for the 363 boxes purportedly shipped pursuant to the June 25, 2014, invoice to fit on the truck. Damouni testified eight pallets could fit on the truck he purportedly used to deliver the products. Ugurlu's undisputed testimony, however, established only 20 boxes could fit on a pallet and, therefore, only 160 boxes could have been shipped at one time, far fewer than the 363 boxes which were purportedly shipped. In addition, the bank records established a $70,000 deposit was made into Istanbul's bank account on June 11, 2014, and, on June 12, 2014, was wired from Istanbul's account to E&N, which corroborated Ugurlu's testimony regarding the June 2014 meeting at the Nile Restaurant.

¶ 72    Moreover, defense counsel highlighted for the trial court the various infirmities and inconsistencies in Ugurlu's testimony through his examinations of the various witnesses. Counsel presented evidence that Ugurlu was under investigation by the Indiana Department of Revenue, that Ugurlu had knowledge about the use of burner licenses which are used to evade tobacco taxes,

and extensively argued that Ugurlu was not a credible witness based on the evidence which had been presented. In finding defendant guilty, the trial court stated it had assessed the credibility of the witnesses. Based on this record, we are not convinced the trial court would have assessed Ugurlu's testimony any differently had defendant been permitted to elicit evidence of Ugurlu's conviction. See *Stull*, 2014 IL App (4th) 120704, ¶ 104. Accordingly, we conclude, even if the trial court erred by granting the State's motion *in limine*, the error was harmless.

¶ 73 Defendant next contends he is entitled to a new trial because the trial court "repeatedly allowed the State to interject objections which disrupted the questioning of Key concerning Ugurlu's participation in tobacco-tax-evasion schemes, a matter of great import to the defense due to the centrality to the State's case of Ugurlu's credibility." Defendant asserts the trial court precluded him from fully questioning Ugurlu and Key concerning Ugurlu's history with tobacco tax evasion, which denied his right to due process and a fair trial.

¶ 74 The State responds defendant has forfeited this contention by failing to identify "any objection that should have been overruled, or any question counsel was prevented from asking, let alone provide a legal argument supporting his claim." We agree.

¶ 75 This court is entitled to have the issues before it clearly defined and supported by a cohesive argument containing citation to pertinent legal authority and the relevant pages of the record. *Lopez v. Northwestern Memorial Hospital*, 375 Ill. App. 3d 637, 648 (2007); Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018). This court is not a depository into which a party may dump the burden of research and argument. *Lopez*, 375 Ill. App. 3d at 648. Points not argued are forfeited. Ill S. Ct. R. 341(h)(7) (eff. May 25, 2018). A vague allegation of error is not "argued" and does not satisfy the requirements of Rule 341. *Vancura v. Katris*, 238 Ill. 2d 352, 370 (2010).

¶ 76    Here, defendant's brief fails to identify the specific objections which he asserts were improperly sustained by the trial court. Instead, he vaguely refers to the State's interjection of hearsay and improper impeachment objections throughout counsel's attempt to examine Key in regard to the Department's investigation of defendant and its decision to trust Ugurlu. Accordingly, we conclude defendant has not set forth argument in support of his contention and, therefore, forfeited review of this issue.

¶ 77    Even if we were to overlook defendant's forfeiture, we find the record positively rebuts his contention, and it, therefore, lacks merit. Defendant contends the State's objections frustrated his attempt to inquire into the Department's decision to trust Ugurlu. He also contends the trial court limited his inquiry on this topic. The pages of the record on which defendant relies to support his contention clearly show the trial court instructed defense counsel he could "still accomplish goal" but could not do so by asking Key about his grand jury testimony unless counsel laid a proper foundation for impeaching Key with his prior testimony. Moreover, the record shows defense counsel, in fact, questioned Key regarding the Department's decision to trust Ugurlu, including whether Key had confirmed Ugurlu's statements to him by speaking with other witnesses, Daoud and Halawa.

¶ 78    Additionally, defendant highlights an offer of proof defense counsel made during Key's testimony—that Ugurlu testified before the grand jury that he had asked Aziz about his pay check and the fact he was not getting paid $1500. During Ugurlu's testimony, however, Ugurlu admitted he had given this testimony. Thus, defense counsel had completed his impeachment of Ugurlu on that issue during Ugurlu's testimony.

¶ 79 Defendant also claims his attempt to ask Key about his conversation with federal law enforcement officials in March 2015 regarding the truck-to-truck transfer involving Basik Trading and Istanbul at the Cabela's store in Hammond, Indiana, as reflected on a report authored by Key was frustrated by the State's objections. However, the record establishes Key testified about the information he had received from federal law enforcement officials. We fail to see how defendant's attempt to elicit this evidence was frustrated by the State's objections when the evidence was in, fact, admitted.

¶ 80 Defendant's final contention is that he is entitled to a new trial based on the newly discovered evidence—Schoenbach's affidavit—he presented in his amended motion for a new trial. We disagree.

¶ 81 "[A] motion for a new trial predicated on newly discovered evidence is addressed to the discretion of the trial judge and denial of such a motion shall not be disturbed upon review [absent] a showing of an abuse of discretion." *People v. Smith*, 177 Ill. 2d 53, 82 (1997). The supreme court has noted that, when such a motion is made, " '[a] distinction is to be drawn between evidence which impeaches a witness in the sense that it affects the credibility of the witness, and evidence which is probative in that it presents a state of facts which differs from that to which the witness testified.' " *Id.* at 82-83 (quoting *People v. Holtzman*, 1 Ill. 2d 562, 568 (1953)). Thus, newly discovered evidence which merely discredits, contradicts, or impeaches a witness does not require a new trial. *Id.* Rather, a new trial is warranted only where the new evidence contradicts a witness with facts that have such probative force or weight to produce a result different at trial. *Id.*

¶ 82 The parties dispute whether Schoenbach's affidavit was newly discovered evidence. The State contends the record shows the information contained therein was tendered to defense counsel

by email prior to trial. Defendant responds the record does not contain the emails at issue and, therefore, the record does not support the State's argument.

¶ 83     We need not resolve the parties' dispute because the affidavit, even if it was newly discovered evidence, did not entitle defendant to a new trial. Schoenbach's affidavit failed to present a version of events which differed from that presented through the State's witnesses. Stated differently, it did not present facts establishing defendant did not, in fact, file a tax return with inflated out-of-state sales to Istanbul, fabricate an invoice to support the inflated out-of-state sales, or give Ugurlu $70,000 in cash with instructions to deposit it into Istanbul's business account and immediately wire it back to E&N. Rather, it established Basik sold tobacco products to Ugurlu, who, at the time, was doing business as Istanbul or Four Seasons and did not have a valid Indiana license, and contradicted Key's testimony as to who owned Four Seasons, a fact immaterial to defendant's guilt. In other words, the facts set forth in the affidavit sought to discredit Ugurlu by asserting he was the type of person who would engage in schemes to avoid tobacco tax. Accordingly, we conclude the trial court did not abuse its discretion by denying defendant's motion for a new trial based on the newly discovered evidence. See *id.*

¶ 84     For the reasons stated, we affirm the trial court's judgment.

¶ 85     Affirmed.